**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1848**

EUNICE GRAVES,

       Plaintiff – Appellant,

   and

CARLIN ROBINSON, individually, as Guardian and next Friend of I.Y., M.Y. and A.Y., and as Personal Representative of the Estate of Veronica Williams, Deceased,

       Plaintiff,

   v.

DANIEL A. LIOI; MELVIN RUSSELL, Major,

       Defendants – Appellees

   and

BALTIMORE CITY POLICE DEPARTMENT,

       Defendant,

CLEAVEN L. WILLIAMS, JR.,

       Defendant.

**No. 17-1857**

CARLIN ROBINSON, individually, as Guardian and next Friend of I.Y., M.Y. and A.Y., and as Personal Representative of the Estate of Veronica Williams, Deceased,

Plaintiff – Appellant,

and

EUNICE GRAVES,

Plaintiff,

v.

DANIEL A. LIOI; MELVIN RUSSELL, Major,

Defendants – Appellees,

and

BALTIMORE CITY POLICE DEPARTMENT,

Defendant,

CLEAVEN L. WILLIAMS, JR.,

Defendant.

---

Appeals from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, District Judge. (1:12-cv-00192-CCB)

---

Argued: September 26, 2018                    Decided: July 16, 2019

---

Before GREGORY, Chief Judge, and NIEMEYER and AGEE, Circuit Judges.

---

Affirmed by published opinion. Judge Agee wrote the opinion in which Judge Niemeyer joined. Chief Judge Gregory wrote a dissenting opinion.

---

**ARGUED:** Cary Johnson Hansel, III, HANSEL LAW, P.C., Baltimore, Maryland, for Appellants. Elisabeth Susanne Walden, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees. **ON BRIEF:** Daniel L. Cox, THE COX LAW

CENTER, LLC, Emmitsburg, Maryland, for Appellants. Suzanne Sangree, Senior Public Safety Counsel, Daniel C. Beck, Chief of Police Legal Affairs, Kara K. Lynch, Assistant Solicitor, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees.

―――――――――

AGEE, Circuit Judge:

Cleaven Williams stabbed his pregnant wife, Veronica ("Mrs. Williams"), outside a Baltimore, Maryland, courthouse where she had just obtained a protective order against him. Mrs. Williams and her unborn child died from their injuries a few days later. Carlin Robinson, the Personal Representative of Mrs. Williams' estate and Guardian and Next Friend of her children, and Eunice Graves, Mrs. Williams' mother, filed federal and state claims against Baltimore City Police Department (BCPD) officer Daniel A. Lioi. The Complaint alleged that Lioi was responsible for Mrs. Williams' death because he enabled Williams to postpone his self-surrender on a misdemeanor arrest warrant, which provided Williams the opportunity to murder his wife.

We previously affirmed, on interlocutory appeal, the district court's denial of Lioi's motion to dismiss the claims against him as being barred by qualified immunity. *Robinson v. Lioi*, 536 F. App'x 340 (4th Cir. 2013). Thereafter, Robinson and Graves (collectively "Robinson") amended their complaint to add another BCPD officer, Major Melvin Russell, as a defendant. Following discovery, the district court granted summary judgment to both officers, *Robinson v. Lioi*, No. 1:12-cv-00192-CCB, 2017 WL 2937568 (D. Md. June 30, 2017), concluding that the evidence was not sufficient to allow a verdict in Robinson's favor and, in the alternative, the officers were entitled to qualified and public official immunity.

Robinson now appeals. For the reasons set forth below, we affirm the judgment of the district court.

4

# I.

In reviewing the propriety of granting summary judgment, we consider the facts in the light most favorable to the nonmoving party, here, Robinson, and draw all reasonable inferences in her favor. *See Doe v. Rosa*, 795 F.3d 429, 436 (4th Cir. 2015).

## A.

In the summer of 2008, Williams met Deputy Major Lioi and Major Russell of the BCPD's Eastern District in the course of Williams' role as the president of a Baltimore-area community association. The men interacted at a handful of civic events that summer and fall.

The events forming the basis of Robinson's claims occurred over a nine-day period from Sunday, November 9, 2008, when a misdemeanor arrest warrant was issued for Williams' arrest, to Monday, November 17, 2008, when Williams fatally stabbed his pregnant wife.

On the evening of Sunday, November 9, Mrs. Williams obtained a temporary protective order against Williams based on an assault that occurred the prior month in which he physically restrained her and cut off some of her hair. Based on the same incident, the Baltimore City Court Commissioner also issued an arrest warrant for Williams charging him with the misdemeanor offenses of second-degree assault and unauthorized removal of property.

Minutes after the warrant issued, a police dispatcher notified BCPD Officer Jose Arroyo that a misdemeanor warrant was ready to be picked up from the Court

5

Commissioner's office.[1] Had Arroyo followed normal procedure, he would have taken the warrant directly to the "hot desk" at Central Records to have it logged into the police computer database. J.A. 575. Instead, Arroyo took the warrant to the BCPD's Eastern District office. Arroyo indicated that he sometimes bypassed the normal procedure if a supervisor ordered him to do so, but he could not remember whether anyone had issued such an order regarding this warrant. Nor could he provide any explanation for why he deviated from the procedure this time.

After Arroyo arrived at the Eastern District, an unidentified person instructed him to leave the arrest warrant on the desk handling the Sector 1 region. Arroyo could not recall who told him to leave the warrant there, or why, but the address listed on the warrant for Williams was located in Sector 1. Arroyo knew both Lioi and Russell, and when he was specifically asked if Russell or Lioi had instructed him to bring the warrant to the Eastern District, Arroyo testified that he "d[id]n't recall." J.A. 578. He then clarified that, given the chain of command, he would not have received an order directly from either officer and that he "d[id]n't know" whether either of them had given such an instruction to someone else. J.A. 579–80.

At some point over the weekend, Williams contacted Russell and was concerned that his wife "got papers on him." J.A. 706. Williams asked Russell if he could find out

---

[1] When a police dispatcher alerts an officer that a warrant is ready to be picked up, the arrestee is not identified. *See* J.A. 549.

what happened.[2] In his deposition, Russell stated that he first learned of the arrest warrant when he returned to work on Monday or Tuesday (November 10 or 11) and Officer Adrienne Byrd showed it to him.[3] Russell had observed Byrd holding the warrant for Williams in her hands, but he testified that he never took physical possession of the warrant at that time or later.

Russell later spoke with Williams, confirming that there was a warrant for his arrest and encouraging him to turn himself in. J.A. 451–54, 707. Russell advised that Williams should not wait to turn himself in because if he were arrested on a Friday and his arraignment were to be delayed, he could be detained over the weekend.

Beginning on Monday, police officers attempted to arrest Williams at his residence, but were unsuccessful. J.A. 112, 451–52, 485, 707–08, 762, 815. Russell said he personally went by Williams' residence to arrest him "once, maybe twice," but it was dark and no one answered the door. J.A. 451.

On Wednesday (November 12), Williams texted Russell to say that he would like to turn himself in the following Tuesday in order to have time to raise sufficient bond money. Russell called Williams and encouraged him to turn himself in without delay. J.A. 451–52, 482–83. Later that afternoon, Russell informed Lioi—who was the next

---

[2] In his statement during the internal investigation, Russell said that Williams had called him over the weekend "concerned that his wife, as he described it got some papers on him. He was concerned that his wife lied on him, went down to wherever and got papers on him, and he wanted me to see if that was actually true." J.A. 706.

[3] Russell could not recall whether he returned to work that week on Monday or Tuesday, but stated that the earliest his conversation with Byrd would have occurred was the morning of Monday, November 10. J.A. 445, 470.

senior officer in the Eastern District—that Williams would be turning himself in the next evening. Russell asked Lioi to oversee the process because Russell was not scheduled to work Thursday evening.[4]

On Thursday afternoon (November 13), Williams texted Russell that he was "running behind," but "should be there in 15." J.A. 480. Russell replied, "K." J.A. 480. Both men stated in their depositions that the texts referred to Williams self-surrendering, but Williams did not show up at the station that afternoon.

Instead, at about 9:00 p.m., Williams arrived at the Eastern District to self-surrender. Lioi called Central Records to get the arrest warrant and learned that it had not been logged into their database and they did not have the warrant. Lioi enlisted help in searching for the warrant at the Eastern District and in calling other possible locations, but no one could locate it. For example, Lioi called Russell to see if he could help them locate the warrant, but Russell did not answer his phone, so Lioi left him a voice mail message. And when Lioi called the court commissioner, he was told "that the warrant possibly could be at the North Avenue Courthouse," which he also tried to reach, but it was closed for the night. J.A. 562.

---

[4] Russell and Lioi both stated that Russell did not ask that Williams be given special treatment, but just that "because of [Williams'] role in the community, to make sure this was being taken care of." J.A. 467 (Russell); J.A. 287–88 (Lioi: "Russell said just be at the district and meet him when he comes in to make sure the process goes well, but nobody said, you know, do anything out of the unusual. . . . He was a community leader, so just make sure everything goes well and that, you know, he's processed and goes to central booking and they walk him through the system.").

After concluding that they were not going to promptly locate the arrest warrant, Lioi allowed Williams to leave the Eastern District station so long as he agreed to return once they found the warrant. Williams agreed and asked if he could self-surrender after the weekend. He mentioned having several things to do and not wanting to risk being detained if the arraignment was delayed on Friday. It's not clear from the record what agreement Lioi and Williams reached at that time, but Williams departed the police station.

Shortly thereafter, Russell returned Lioi's call and recommended that Lioi contact Byrd because he had seen her with the warrant earlier that week and believed she had attempted to arrest Williams. In addition, Russell suggested that Lioi search Byrd's patrol car for the paperwork.

After Russell's call, Sergeant Todd Tugya, who was helping Lioi search for the warrant, telephoned Byrd. She "advised that she did, indeed, have possession of the warrant . . . and that she had attempted to serve it. However, she advised that she left the warrant in the visor of her patrol car because she intended to continue her attempts to serve it on her next shift." J.A. 112. She told Tugya which patrol car she had used, so that they could search it.[5] Just after midnight on Friday (November 14), officers located the warrant over the visor of Byrd's patrol car.

---

[5] When deposed in this case, Byrd could not recall many of the details surrounding these events. She knew she had received some paperwork on Williams at roll call, but did not recall what the papers were. She also could not recall what happened to the papers; she believed "[s]omeone took the paperwork" from her, but she did not know who or
(Continued)

9

Later that day, Lioi "confirmed" with Russell that Williams could self-surrender after the weekend. J.A. 277. Russell indicated to Lioi that was "fine." J.A. 277. Lioi also called Williams to let him know they had found the warrant and he needed to turn himself in. Williams indicated he would self-surrender on Tuesday, and Lioi agreed.

Later that evening, Williams contacted Lioi and said that he was meeting with his lawyers to prepare for his criminal case. Williams suggested that having a letter explaining that he had attempted to self-surrender, but that the warrant could not be located, may help him in court. Lioi agreed to write the letter because those were "the facts." J.A. 285. His letter explained that Williams had been "very cooperative and willing to turn himself in" but that Central Records did not have the warrant on file and had "advised that the warrant was being held at North Avenue Court House, which was closed for the night." J.A. 631.

Williams later asked Lioi for a second letter because his lawyers had discovered an arrest warrant from another Maryland locality charging a "Cleaven Williams" with offenses unrelated to those known to be pending against him. Williams asked Lioi to write about that warrant, too; Lioi provided a letter stating that he had reviewed the other arrest warrant and observed that it contained minimal identifying information about the named individual, referenced an address that "[t]o [Lioi's] understanding[,] [Williams] had never resided at," and that the wanted individual "should not be considered to be [Williams] based on the name alone." J.A. 632. In texting about the letters, Williams

when. J.A. 108. She did not recall trying to serve the arrest warrant or having the papers in her patrol car. J.A. 106–09.

10

asked Lioi for "an overview of the night" and "not too much detail." J.A. 101. When Lioi

agreed, Williams expressed his appreciation, texting "There is a method to my madness:-

/," to which Lioi replied, "That's what I'm afraid of." J.A. 101.

On Monday afternoon (November 17), Williams and Lioi exchanged another set

of text messages—

> [Williams:] . . . I just left my home 2 meet w/my lawyer…I saw my wife drive by…can I go home or what?

> [Lioi:] I wouldn't be alone with her. She could say you did anything. Have a witness with you if you meet.

> [Williams:] Thanks Dan[.]

> [Williams:] Can she do another protection order & try 2 keep me from the house?

> [Lioi:] She could. I would avoid her. She could call the police and say u have the warrant and she is afraid of you. It would force our hand to serve the warrant.

J.A. 559. Williams later called Lioi from his lawyer's office to discuss the two warrants

again, at which time Lioi "t[old] him that he should, you know, turn himself in, the

weekend's over, let's get this taken care of today." J.A. 286. Williams indicated Tuesday

was still better, and Lioi told him to call after leaving the lawyer's office.

A few hours later, Williams stabbed his wife, which resulted in her death and that

of her unborn child.[6]

**B.**

---

[6] Williams was prosecuted in state court, convicted, and sentenced to life imprisonment for his crime.

11

Robinson filed a complaint in Maryland state court alleging that Lioi was liable for Mrs. Williams' death under several state and federal laws. Lioi removed the case to the U.S. District Court for the District of Maryland and moved to dismiss on the basis of qualified immunity.[7] The district court denied Lioi's motion. He appealed, and we affirmed in an unpublished decision. *Robinson*, 536 F. App'x at 340.

Critically, our decision on the motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) necessarily accepted as true all of the allegations in Robinson's Complaint. *Id.* at 341. On that basis, we concluded that the Complaint adequately alleged that Lioi engaged in affirmative acts that could make him liable to Robinson for a violation of Mrs. Williams' due process rights under the state-created danger doctrine. *Id.* at 343–44 (discussing the development of the doctrine that had its genesis in *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)). Robinson alleged that Lioi "withheld the warrant [from the unit that should have served it] so that [the Eastern District] could retain control over whether it would be served or not;" "warned Mr. Williams of the warrant and their feigned efforts to serve him;" "purposefully refused to serve or arrest [Williams when he self-surrendered], falsely claiming instead that the warrant allegedly could not be found. This was an intentional and malicious act . . . for the purpose of allowing Mr. Williams to remain free despite the warrant;" and "placed Mrs. Williams in a police-created zone of danger by intentionally conspiring with Mr. Williams to permit him to remain free despite ample opportunity to arrest him."

---

[7] Robinson also brought claims against the BCPD and Williams, but the district court separately dismissed those claims and they are not at issue on appeal.

Complaint at 4–5, 9, *Robinson v. Lioi*, No. 1:12-cv-00192-CCB, 2012 WL 2992251 (D. Md. July 18, 2012), ECF No. 2.

When we considered whether Lioi was entitled to dismissal of the claims against him, we specifically pointed to these allegations as the basis for our decision. *Robinson*, 536 F. App'x at 341, 344. We concluded that, as a whole, these allegations encompassed affirmative acts that could have "directly enabled" Williams to harm Mrs. Williams. *Id.* at 345. Accordingly, we held that the Complaint adequately alleged a due process violation for Rule 12(b)(6) purposes.

In so doing, we rejected Lioi's reliance on *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005), in which the Supreme Court held that no due process violation occurred when police officers failed to enforce a restraining order. *Robinson*, 536 F. App'x at 345. We explained that "Lioi's alleged conduct in this case was not confined to a failure to execute [an] arrest warrant," but rather included allegations that he "affirmatively acted to interfere with execution of the warrant by conspiring with Cleaven Williams to evade capture and remain at large." *Id.*

## C.

After Lioi's prior appeal, Robinson amended her Complaint to add Russell as a defendant. She alleged the following claims against both officers: violation of Mrs. Williams' due process rights, in violation of 42 U.S.C. § 1983; conspiracy to violate Mrs. Williams' constitutional rights, in violation of 42 U.S.C. § 1985; and numerous Maryland

13

state law claims.[8] The alleged factual basis of the claims remained substantively the same as in her original Complaint.

After discovery, Lioi and Russell moved for summary judgment, challenging the substantive claims and arguing that they were entitled to qualified immunity on the federal claims and to public official immunity on the state claims. In addition to deposition statements, affidavits, and other records from the participants in the events described above, Lioi and Russell submitted an affidavit from an expert witness, Stanford O'Neill Franklin, an officer with thirty-four years of law enforcement experience in Maryland, including time with the BCPD. In relevant part, Franklin stated that, in his experience, if Williams had "been arrested and processed" following his Thursday evening self-surrender, "he would have been released within 24 hours on his personal recognizance, or required to post minimum bail, which means he would have been back on the street by Saturday morning, November 15, 2008." J.A. 127–28.

The district court awarded summary judgment to Lioi and Russell. *Robinson*, 2017 WL 2937568, at *14. It concluded that a jury could not find in favor of Robinson on the substantive question of whether the officers' conduct constituted a state-created danger because Robinson's evidence did not show that Lioi and Russell "committed affirmative acts that created or enhanced the danger to" Mrs. Williams. *Id.* at *9. The district court held in the alternative that Lioi and Russell were entitled to qualified immunity because,

---

[8] Robinson alleged Maryland claims of wrongful death, survival action, gross negligence, reckless endangerment, intentional infliction of emotional distress, and common law conspiracy.

even if a violation had occurred, it was not clearly established. The court explained: "the facts are not sufficient to show that a reasonable officer in either defendant's position would have understood he was violating" Mrs. Williams' rights by "using [his] discretion not to aggressively serve an arrest warrant and instead allow Mr. Williams to delay his date of voluntary surrender by several days." *Id.* at \*10.

The district court also granted Lioi and Russell summary judgment on Robinson's other claims. *Id.* at \*10–14. In relevant part, it held that the conspiracy claims could not survive because Robinson produced no evidence of a conspiracy to violate Mrs. Williams' constitutional rights and no evidence that Lioi's and Russell's conduct caused her death. *Id.* at \*10–11. Similarly, the court held that the officers were entitled to summary judgment on the gross negligence claim because Robinson produced no evidence that they intended to injure Mrs. Williams or were so utterly indifferent to her rights that they acted as if her rights did not exist. *Id.* at \*11–12. In addition, it held that the causation element had not been satisfied. *Id.* at \*12–13. The district court also granted Lioi and Russell summary judgment on the wrongful death and survival actions because they were entitled to public official immunity under Maryland law for any negligent conduct and no evidence supported intentional misconduct or gross negligence. *Id.* at \*14. It further concluded those claims would also fail on causation grounds. *Id.*

Robinson noted a timely appeal, and the Court has jurisdiction under 28 U.S.C. § 1291.

15

## II.

Robinson's appeal focuses on the district court's award of summary judgment to Lioi and Russell on her § 1983 substantive due process claim. She contends the record adequately demonstrates that Lioi and Russell committed various affirmative acts that could make them liable under the state-created danger doctrine. Robinson further challenges the district court's alternative holding that the officers were entitled to qualified immunity on the due process claim. Lastly, she challenges its judgment in favor of Lioi and Russell on her state-law claims.

This Court reviews de novo the district court's grant of summary judgment. *Doe*, 795 F.3d at 436. Summary judgment is appropriate if the evidence shows that "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), such that "'a reasonable jury could [not] return a verdict for the nonmoving party,'" *Doe*, 795 F.3d at 436 (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Stating the standard of review is usually a fairly rote practice, but it has particular significance in this case given the contrast that it signals between this appeal and our prior review of Robinson's allegations. In this case, we are confronted with the view proposed in Robinson's briefs and adopted by the dissenting opinion that the outcome of this appeal should be dictated by our prior decision. *E.g.*, Opening Br. 19 (asserting the district court's opinion "virtually ignored" the Court's prior decision, which had "already held" that Lioi and Russell's conduct fell within the state-created danger theory). Relying on the law-of-the-case doctrine, the dissent accuses us of "rescind[ing] our prior holding,

16

shielding [this] decision . . . with the defense that we are now at the summary judgment stage." *Infra* at 64–65. But there is nothing remarkable in the black-letter law understanding that plaintiffs are held to different standards at different stages of the proceedings in the district court, or that appeals from those decisions are also subject to different standards.

It cannot be put more plainly: we previously considered whether Robinson's *allegations* stated a claim against Lioi because we were considering only the district court's decision to deny a motion to dismiss under Rule 12(b)(6). Now, we are reviewing whether Robinson's *evidence* supports a claim against Lioi and Russell because we are considering the district court's decision to grant a motion for summary judgment under Rule 56(a). *Bennet v. Spear*, 520 U.S. 154, 168 (1997) (contrasting the pleading stage, where "on a motion to dismiss [courts] presume that general allegations embrace those specific facts that are necessary to support the claim" with the summary judgment stage, where "a plaintiff must set forth [specific facts] by affidavit or other evidence" (internal quotation marks and alterations omitted)). This "wholly different substantive and procedural context" matters when analyzing Robinson's claim. *See SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 109 (4th Cir. 2018). Unlike the first time this case came before us, we are no longer obliged to accept Robinson's allegations as true. While Robinson is still entitled to have the record viewed in the light most favorable to her, we can no longer simply accept her characterizations of what occurred. Now that the parties have completed discovery, we have a "fully-developed record" to apply "to those allegations upon a motion for summary judgment," *id.*, and Robinson must present more

17

than a "scintilla" of evidence to support her allegations, *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995) (internal quotation marks omitted).

There is also nothing remarkable in concluding that some plaintiffs whose claims survive a motion to dismiss are unable to meet their burden to survive summary judgment. In *Behrens v. Pelletier*, 516 U.S. 299 (1996), for example, the Supreme Court held that a defendant was entitled to raise the defense of qualified immunity in more than one interlocutory appeal—initially, after denial of a motion to dismiss, and, subsequently, after denial of summary judgment. The Supreme Court explained that more than one appeal was warranted because

> the legally relevant factors . . . will be different on summary judgment than on an earlier motion to dismiss. . . . . It is no more true that the defendant who has unsuccessfully appealed denial of a motion to dismiss has no need to appeal denial of a motion for summary judgment, than it is that the defendant who has unsuccessfully *made* a motion to dismiss has no need to *make* a motion for summary judgment.

*Id.* at 309.

Nothing inherent in our prior decision or the law-of-the-case doctrine precludes our conclusion in this appeal that Robinson has failed to meet her burden on summary judgment. The law-of-the-case doctrine recognizes that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). But it poses no bar to the assessment of past holdings based on a different procedural posture when, as is the case in the progression from review of a motion to dismiss to a motion for summary judgment, that later review expands the court's inquiry based on development of actual

18

facts underlying a plaintiff's claims. *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 329–30 (3d Cir. 2016) (rejecting the plaintiff's argument that because the court had previously held that her complaint sufficiently alleged a claim, the district court was precluded from granting summary judgment under the law-of-the-case doctrine and describing that argument as resting on a "critical misapplication of the fundamental distinction between a motion to dismiss under Rule 12(b)(6) and a motion for summary judgment under Rule 56"). Indeed, consistent with this recognition, this Court's articulation of the law-of-the-case doctrine also acknowledges that different facts will lead to a different legal analysis to which the doctrine cannot apply. *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988) (stating that the law-of-the-case doctrine applies "unless" one of several exceptions applies, including the subsequent development of "substantially different evidence").

As the dissent acknowledges, nothing in the law-of-the-case doctrine or our prior decision compelled a particular result in this appeal except to the extent the facts remained the same as the allegations. *Infra* at 64–67. The cases the dissent relies on to support the doctrine's applicability reiterate that when a court is presented with a different record at a new stage of the case, the law-of-the-case doctrine will no longer constrain the court's review. *E.g.*, *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009). But only when the facts alleged in a complaint are subsequently proven during discovery will the law-of-the-case doctrine continue to govern how the law applies to those facts. *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 665–66 (4th Cir. 2005) (holding that the law-of-the-case doctrine was relevant to the

19

Court's review because the case's evidence developed during discovery and considered as part of the motion for summary judgment "confirmed the existence of the[] facts" previously relied on in considering the propriety of a motion to dismiss).

Discovery produced substantially different facts than Robinson alleged in her Complaint which requires us to alter our understanding of the factual underpinnings of Robinson's claim for purposes of summary judgment. Based on this divergence, the law-of-the-case doctrine does not constrain our review of how the governing legal principles apply to Robinson's claim. At bottom, the evidence that Robinson marshaled during discovery demonstrates that Russell and Lioi's conduct cannot support a state-created danger substantive due process claim and that the officers are entitled to qualified immunity.

**III.**

Individuals can hold state actors liable under § 1983 for deprivations of "any rights, privileges, or immunities secured by the Constitution," 42 U.S.C. § 1983, including deprivations of a person's "life, liberty, or property, without due process of law," U.S. Const. amend. XIV. Because the Due Process Clause protects individuals "against arbitrary action of government," with "arbitrary" in this context encompassing "only the most egregious official conduct," no constitutional violation occurs where the state actor "negligently inflicted harm." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46, 49 (1998) (internal quotation marks omitted).

20

Moreover, the Due Process Clause "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *DeShaney*, 489 U.S. at 195. And "because 'the Due Process Clause does not require the State to provide its citizens with particular protective services, [state actors] cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them.'" *Doe*, 795 F.3d at 437 (quoting *DeShaney*, 489 U.S. at 196–97).

Based on this understanding of the Due Process Clause, the Supreme Court held in *DeShaney* that a county social services department had not violated a four-year-old's substantive due process rights by failing to protect the child from his abusive father. 489 U.S. at 191–94. The department had received numerous reports of abuse but failed to remove the child from his father's custody. *Id.* at 192–93. The Supreme Court recognized that although "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection" based on a "special relationship," no such relationship existed in this case because the child was not in the State's custody (e.g., through "incarceration, institutionalization, or other similar restraint of personal liberty") when his father harmed him. *Id.* at 197–200. As part of its due process analysis, the Supreme Court observed that the department was also not liable because, "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201. "This language in *DeShaney* is commonly acknowledged as the genesis of the state-created danger doctrine." *Robinson*, 536 F. App'x at 343.

21

But the state-created doctrine is a "narrow" exception to the general rule that state actors are not liable for harm caused by third parties. *Doe*, 795 F.3d at 437. It applies only when the state affirmatively acts to create or increase the risk that resulted in the victim's injury. Specifically, "a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission." *Id.* at 439. A direct, affirmative act is necessary because liability is premised on the understanding that state actors cannot "disclaim liability when they themselves throw others to the lions" and that where they have engaged in affirmative conduct that creates or increases "the dangerous situation that resulted in a victim's injury," "it becomes much more akin to a[ ] [state] actor itself directly causing harm to the injured party." *Pinder v. Johnson*, 54 F.3d 1169, 1177 (4th Cir. 1995) (en banc). The doctrine's conception of an "affirmative act" is also quite limited: "[i]t cannot be that the state commits an affirmative act or creates a danger every time it does anything that makes injury at the hands of a third party more likely. If so, the state would be liable for every crime committed by the prisoners it released." *Id.* at 1175 (internal quotation marks omitted). This narrowly confines the scope of qualifying "affirmative acts" to those that directly create or increase, i.e., cause, the risk a third party posed to the victim.

In this appeal, Robinson argues that the district court erred because the record demonstrates that Lioi and Russell took "affirmative acts" from which a reasonable jury

22

could conclude that they directly increased the risk Williams posed to his wife.[9] To support her argument that the officers are liable for a state-created danger, Robinson relies on the following eight "affirmative acts" that she claims made summary judgment inappropriate:

(1) Lioi "acted affirmatively" to free Williams from the Eastern District station after he could not locate the arrest warrant instead of placing Williams under arrest without the warrant and temporarily detaining him in the holding cell while the search for the missing warrant continued;

(2) Lioi "affirmatively agreed" to permit Williams to remain free between the time Williams tried to self-surrender and the time of Mrs. Williams' stabbing;

(3) Lioi wrote two letters to Williams "in an effort to aid Williams in avoiding lawful arrest on valid warrants";

(4) "Lioi texted Williams regarding when it was safe to return home without fear of arrest and how to avoid service of his warrant";

(5) "Lioi prevented other officers from attempting to arrest" Williams by not assigning anyone to serve the arrest warrant and not logging it into a system that would have allowed other officers to serve it;

(6) "Russell ordered that the warrant not be logged in with Central Records";

(7) "Russell orchestrated the unavailability of the warrant during" the time when Williams appeared to self-surrender; and

(8) "Russell affirmatively ordered that Williams not be arrested" after the warrant was located.

Opening Br. 17–18.

---

[9] Robinson's Amended Complaint also appears to have alleged liability based on the existence of a special relationship, but she does not rely on that ground on appeal.

23

Having reviewed the record, we conclude that Robinson's arguments lack merit. Contrary to Robinson's argument and the dissent's conclusion, discovery did not strengthen her earlier allegations that BCPD officers actively conspired to help Williams avoid arrest by interfering with the execution of his arrest warrant. Quite to the contrary. Even viewing the evidence in Robinson's favor, none of the "affirmative acts" she relies on can support a due process claim. Our conclusion follows from a straight-forward application of the Supreme Court's decisions in *DeShaney* and *Town of Castle Rock*, as well as this Court's decisions in *Pinder* and *Doe*.

As discussed in greater detail below, most of Robinson's characterizations of the record are not supported by the record or are pure speculation. Several of Robinson's key allegations in her Complaint concerning Lioi's supposed affirmative acts ultimately proved to be untenable. And other distinctions between Robinson's allegations in her Amended Complaint and the evidence now in the record show that her claim is mostly based on conduct properly categorized not as legally cognizable affirmative acts, but as nonactionable inactions and omissions.

Equally fatal to Robinson's claim, she has failed to produce evidence demonstrating the requisite causal link between the officers' purported "affirmative acts" and the harm that befell Mrs. Williams. Without evidence to support the conclusion that their conduct increased the danger Williams posed to his wife, we can hold neither Lioi nor Russell liable under the state-created danger doctrine. In short, what occurred in this case is not the sort of conduct that the Supreme Court or this Court has said can give rise to liability. The state-created danger doctrine requires proof that Lioi or Russell *created*

24

the harm that befell Mrs. Williams or *directly* "render[ed] [her] any more vulnerable to" Williams. *Doe*, 795 F.3d at 438 (emphasis omitted) (quoting *DeShaney*, 489 U.S. at 201). That is, it requires proof that Lioi or Russell were more than merely negligent or that they could have done more to ensure Williams was arrested earlier, which is the most that Robinson's and the dissent's view of the record allows.

### A. Lioi's Letters and Texts to Williams Cannot Support Liability

The record confirms that Lioi wrote two letters at Williams' request and responded to a few texts Williams sent between his attempted self-surrender Thursday evening and Mrs. Williams' murder the following Monday. Robinson, however, mischaracterizes those acts and draws conclusions that the record does not support.[10] These events cannot support a state-created danger claim because the record does not allow for the conclusion that they created or increased the risk Williams posed to his wife.

Before turning to the legal principles, it is necessary to first understand what the record shows Lioi actually did. Robinson points to the letters Lioi wrote for Williams, which she characterizes as giving Williams "'get out of jail free' cards." Opening Br. 27. Neither letter provides any such instruction or request. The first letter truthfully describes the contents of the arrest warrant, Williams' voluntary appearance at the Eastern District station "to turn himself in to be processed," and his permitted departure when "Central Records did not have the warrant on file." J.A. 631. It also truthfully states that when Lioi

---

[10] This section specifically addresses Robinson's third and fourth "steps," namely: that Lioi (3) wrote two letters for Williams about the arrest warrants, and (4) texted Williams in the days prior to Mrs. Williams' death.

decided to allow Williams to leave, he had been told that the warrant may be in the courthouse, which was closed for the night.

The second letter accurately recounted that another warrant issued by a different Maryland locality sought the arrest of "a Cleaven Williams, black male with no date of birth or any other identifiers such as a social security number, height, weight, etc.," and listing an address that—to Lioi's understanding—had never been Williams' address. J.A. 632. The second letter observed that the arrest warrant's information was "very limited and should not be considered to be [Williams] based on the name alone." J.A. 632.

A jury could not conclude from these letters that Lioi wrote them "in furtherance of a conspiracy to allow Williams to evade arrest . . . that ultimately enhanced the danger to Mrs. Williams." *Infra* at 68. Both letters state facts and neither makes any demands on a recipient or requests that anyone who reviewed their contents not arrest Williams on either warrant. Nor is the first letter misleading, as the dissent suggests, as Lioi accurately described the events leading to the decision not to arrest Williams on the evening he attempted to self-surrender. The "omission" of additional information about where the warrant was eventually located has no bearing on Williams' cooperation or Lioi's decision to allow him to leave. Similarly, the second letter simply concludes that the warrant had few details; it does not purport to be the result of a thorough investigation or a final conclusion as to the proper subject of the warrant. In short, Robinson has provided no facts to support her continued characterization of the letters as evidence that Lioi "scheme[d] to secure [Williams'] freedom." Opening Br. 28.

Lioi's texts cannot support liability either. Robinson posits that Lioi "texted Williams regarding when it was safe to return home without fear of arrest and how to avoid service of his warrant." Opening Br. 18. The record does not support that characterization of the texts. The texts instead show that Lioi relayed factual information about the status of the warrant[11] and its possible execution before Williams' intended self-surrender date[12] and that Lioi encouraged Williams to "avoid" Mrs. Williams. J.A. 559 ("I wouldn't be alone with her. . . . . Have a witness with you if you meet. . . . . I would avoid her."). Contrary to Robinson's contention, the texts do not reasonably suggest that Lioi was helping Williams to "avoid[ ] his lawful arrest" or otherwise endangering Mrs. Williams in any way. *See* Opening Br. 30.

Nothing else the dissent points to alters this analysis. For instance, the dissent asserts "Lioi had never written such letters before in his twenty years of law enforcement experience." *Infra* at 60 (citing J.A. 287–88). But Lioi never stated that he had not previously written such letters; instead, he responded by reflecting on Williams having been "a community leader" who was "known to us, and one of the key factors in everything would be is he a flight risk, is he attempting to turn himself in, which he did, so I think all that weighed into the – the process." J.A. 287. Even granting Robinson the

---

[11] J.A. 696–97 (responding to Williams' question about whether Mrs. Williams could "resc[i]nd the charges/warrant" with, "No. She should contact the Court Comm[issioner] that she saw, but they won't rescind.").

[12] J.A. 559 (responding to Williams' question about whether his wife could "do another protection order & try 2 keep me from the house" with, "She could. I would avoid her. She could call the police and say u have the warrant and she is afraid of you. It would force our hand to serve the warrant.").

inference that the letters were a "first," that fact would not allow for any inference concerning Lioi's intent or to connect Lioi's letters to Mrs. Williams.

In addition, the dissent posits that Lioi's texts suggest "his desire *not* to do his job and instead to defer to Williams's prearranged self-surrender schedule." *Infra* at 71. Even accepting the dissent's view, that would show only (1) that Lioi decided not to serve the warrant sooner, a decision amounting to no more than an omission or failure to act that falls under the ambit of *Town of Castle Rock*, or (2) that Lioi may have been negligent in pursuing service of the warrant, a decision that also could not give rise to a due process claim. *See Lewis*, 523 U.S. at 849 (stating that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process"); *Slaughter v. Mayor & City Council of Balt.*, 682 F.3d 317, 321 (4th Cir. 2012) (reiterating that negligence cannot support a due process violation).

Regardless, neither the letters nor the texts can support a cognizable due process claim because they are not causally connected to Mrs. Williams' harm. Whatever "affirmative acts" a plaintiff relies on must have a direct causal connection to the harm that ultimately befell the victim. *See Doe*, 795 F.3d at 439; *see also Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 916–17 (10th Cir. 2012) (calling "unremarkable" the proposition that a state-created danger claim must prove "a sufficient *causal link* between the danger created by an affirmative act of the State and the harm inflicted upon the victim by a private party"); *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006) ("[A] specific and deliberate exercise of state authority, while necessary to [state a claim under this theory], is not sufficient. There must be a direct causal relationship between

28

the affirmative act of the state and the plaintiff's harm. Only then will the affirmative act render the plaintiff more vulnerable to danger than had the state not acted at all." (internal quotation marks omitted)).

Neither Lioi's letters nor his texts created any danger to Mrs. Williams. Indeed, Lioi "could not have created a danger that already existed." *See Doe*, 795 F.3d at 439 (internal quotation marks omitted). As the circumstances of the misdemeanor assault warrant and other evidence in the record indicate, any threat that Williams posed to his wife existed prior to and independent of Lioi's interactions with Williams. Nothing in the record suggests Lioi had any particularized reason to believe that Williams posed an ongoing—let alone imminent—threat to his wife; at most, he knew that probable cause supported issuance of a misdemeanor arrest warrant for assaulting her in the past, which is the only information contained in the arrest warrant. As such, Lioi's letters and texts did not *create* any danger to Mrs. Williams.

Nor did Lioi's letters or texts increase the risk Williams posed to Mrs. Williams. In *Doe*, we held that a state actor did not increase the risk a child predator posed to his victims where the state actor's conduct placed the victims in "no worse position than that in which [they] would have been had [he] not acted at all." *Id.* (first alteration in original) (internal quotation marks omitted). That's precisely the case here. For instance, the record does not indicate that Williams ever showed the letters to anyone, let alone that he used them to avoid arrest. Similarly, it would be patently unreasonable to conclude that texts encouraging Williams *not* to see his wife at all, or at least not alone, heightened any risk to her. Nor can any viable connection be made between any threat Williams posed to

29

his wife and his texts to Lioi concerning the contents of the letters. In short, the letters and texts simply do not establish the requisite connection between Lioi and Mrs. Williams that would create liability under the state-created danger doctrine. *See Pinder*, 54 F.3d at 1177 (providing that, to state a claim, there must be evidence that the state actors did something "akin to . . . directly causing harm to the injured party").

These "acts" do not constitute the sort of direct acts the state-created danger doctrine requires for a state actor's conduct to create or increase the risk that a third party poses to a victim. As in *Doe*, we conclude that the sort of "downstream, but-for connection alleged here simply stretches the 'affirmative acts' concept too far." 795 F.3d at 442. Consequently, they cannot support Robinson's claim against Lioi.

## B. Russell's Conduct Concerning the Arrest Warrant Cannot Support Liability

The three "acts" Robinson asserts that Russell took do not support her claim against him.[13] Robinson asserts as fact that Russell "ordered that the warrant not be logged in with Central Records"; "orchestrated the unavailability of the warrant during the attempted surrender"; and "ordered that Williams not be arrested . . . even after the warrant was found." Opening Br. 18. But Robinson's characterizations of the record stretch beyond permissible inferences to impermissible speculation. Moreover, they do

---

[13] This section specifically addresses Robinson's sixth, seventh, and eighth (in part) asserted "affirmative steps," i.e., that Russell (6) ordered Arroyo to divert the arrest warrant so that it would not be logged into the Central Records system; (7) arranged for the warrant to be in the visor of Byrd's vehicle so that it could not be located when Williams arrived to self-surrender; and (8) ordered that no one arrest Williams after the arrest warrant was located.

not demonstrate that Russell engaged in the sort of affirmative acts that created or increased any danger to Mrs. Williams as required for a state-created danger claim.

Even assuming Russell had the warrant "pulled" and routed to the Eastern District office, the record contains no evidence that Russell was aware that the warrant had not been logged into Central Records prior to its arrival there, that he directed that it not be logged into Central Records, or that he instructed his officers not to attempt to arrest Williams. Nor does the record contain evidence to allow the inference that Russell "orchestrated the unavailability of the warrant" when Williams arrived to self-surrender on Thursday, November 13. *See* Opening Br. 18. To support her view, Robinson weaves mischaracterizations of the record with pure speculation to contend that a jury could infer that her allegations actually occurred. That is not a valid means of surviving summary judgment, which requires evidence, not unsupported conjecture. *See, e.g.*, *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 320 (4th Cir. 2012) (rejecting plaintiff's "attempt[ ] to build his case through pure inference"); *Hinkle v. City of Clarksburg*, 81 F.3d 416, 423 (4th Cir. 1996) (holding a claim was "ripe for an adverse summary judgment determination" when "it was based upon a theory without proof" and dependent on "speculation and the piling of inferences"); *Barwick v. Celotex Corp.*, 736 F.2d 946, 962 (4th Cir. 1984) (rejecting plaintiff's "attempt[ ] to build one vague inference upon another vague inference to produce a factual issue").

By way of background, Robinson relies on a supposed "friendly relationship" between Russell and Williams, Opening Br. 33, pointing out that they communicated via their cell phones throughout the days in question and that Williams used informal

language when texting Russell. In addition, she notes that Russell had been to Williams' home and met his family and had discussed a spiritual matter with Williams in the past. These isolated parts of the record do not support Robinson's conclusion that the men were more than professional acquaintances.[14] Even if they did, these facts offer no information about Russell's conduct with respect to the warrant.

Robinson also points to a text Williams sent to Russell on Thursday afternoon saying, "I'm running behind. I should be there in 15," J.A. 480, as the basis for accusing Williams and Russell of having a "secret meeting," Opening Br. 34. But no evidence suggests that such a meeting occurred, and both men explained that the text referred to Williams intending to self-surrender on Thursday earlier than when he eventually arrived. Moreover, neither the text nor even an imagined secret meeting could demonstrate that Russell made the warrant unavailable or did anything else regarding the warrant; Robinson is impermissibly piling inference upon inference to reach her desired conclusion.

Next, Robinson takes Lioi's deposition testimony concerning the decision to let Williams leave the Eastern District Thursday evening and speculates that Russell and Williams "had already agreed" to a Tuesday surrender date because Russell "assured that

---

[14] The dissenting opinion also relies on Russell's supposed "relationship" with Williams and the fact they "spoke of personal matters." *Infra* at 72. The implication from both the dissent and Robinson overstates what the record shows, which is that the men interacted at a handful of community events, that Russell entered Williams' home briefly on one occasion during a community walk that passed by Williams' residence, and that they briefly discussed religion during one of those walks because Russell was also a minister at the time.

the warrant [would be] unavailable" on Thursday. Opening Br. 34–35. That conjecture is an unsupported reading of what Lioi said. Instead, Lioi testified that prior to allowing Williams to leave on Thursday evening, he ensured that Williams agreed to return and self-surrender once the warrant was found. Lioi knew that "Russell had communicated with [Williams] that if he turn[ed] himself [in] on a Friday, [he] could get stuck in the system all weekend." J.A. 277. Williams told Lioi he wanted to wait to turn himself in until after the weekend. Lioi then confirmed with Russell that this would be acceptable. Contrary to Robinson's contention, Lioi's statement does not permit the inference that Russell and Williams had previously arranged for a Tuesday self-surrender because Russell knew (or orchestrated that) Williams would not be able to self-surrender on Thursday. Nor does Lioi's statement support *any* conclusion about Russell and the location of the warrant.

Robinson further posits that Russell put the warrant in the visor of Officer Byrd's squad car, where it was found several hours after Williams attempted to self-surrender. As "proof" for that conclusion, Robinson points to evidence that Russell saw Officer Byrd with the warrant earlier, that Byrd denied having put the warrant in the visor, and that Russell suggested Lioi search there for the warrant. The conclusion Robinson draws from the gaps between these three fragments leaps well beyond the bounds of permissible inferences and crosses into rampant speculation. Although Robinson is entitled to all reasonable inferences in her favor, we cannot ignore undisputed evidence that contradicts her allegations. Russell explained that he suggested to Lioi several places where the warrant might have been, based on his past experience and knowledge of where officers

33

habitually put paperwork. J.A. 456–58. What's more, Tugya stated that the warrant was eventually located based on specific information Byrd provided to them via telephone Sunday evening.[15] No jury could conclude that Russell orchestrated the warrant's unavailability on Thursday evening when the evidence shows that Russell provided Lioi with general information about the warrant's whereabouts and that same evening Byrd confirmed with specific information about its location.

Nor do any of the dissent's additional considerations connect the dots between record evidence and facts from which a jury could hold Russell liable. For instance, the dissent overstates what could be reasonably inferred from Byrd's inability to remember the details of her role in these events. She testified only that she did not "recall" driving to Williams' residence to attempt to arrest him; she was not sure what had happened to the paperwork on Williams; and she did not know prior to her deposition that the warrant was found in the visor of her patrol car. J.A. 106. Byrd's testimony does not implicate Russell in anything, nor does it give rise to the inference that he took the paperwork from Byrd and hid it in her patrol car. Simply put, a witness's statement that she does not know

---

[15] The dissent faults us for relying on Tugya's affidavit. But "materials capable of being reduced to admissible evidence at trial" can be the basis for summary judgment even though "hearsay, like other evidence inadmissible at trial, is ordinarily an inadequate basis for summary judgment." *U.S. Dep't of Hous. & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.*, 64 F.3d 920, 926 & n.8 (4th Cir. 1995); *see* Fed. R. Civ. P. 56(e). To the extent Tugya's affidavit describes what he did during the search for the missing warrant and what effect his conversation with Byrd had on his actions and directions that evening, it is not hearsay and is therefore properly considered. *See* Fed. R. Evid. 801(c); *see also United States v. Safari*, 849 F.2d 891, 894 (noting that a statement is not hearsay if it is offered to prove knowledge, or to show the effect on the listener).

that something happened or how it happened is not affirmative evidence that something else happened or how.

This commonsense conclusion is particularly apt given the additional evidence in the record that fills in gaps in Byrd's recollection in a way that contradicts Robinson's speculation as to Russell's conduct. Specifically, Tugya's affidavit states that when he called Byrd during the Thursday evening search for the warrant, she advised that she had put the warrant in the visor of her patrol car earlier in the day, that he tracked down which patrol car she had used, and that officers found the warrant. Thus, the record evidence shows that Russell's conversation with Lioi led officers to Byrd and eventually to the discovery of the warrant. No reasonable jury could conclude in the face of this evidence that Russell had orchestrated the warrant being unavailable when Williams' self-surrendered or that Russell conspired to help Williams to evade arrest.

To bolster its conclusion that Russell could be held liable, the dissent takes certain statements out of context to create the illusion that Russell's willingness to allow Williams to self-surrender was unprecedented. But the record demonstrates that Lioi estimated 15 to 20 people a year would self-surrender in the Eastern District, and Russell agreed that sounded right. J.A. 468. And while Russell admitted that "it could have been the only time" at the Eastern District that someone called and said he would self-surrender "more than 24 hours after the call," he immediately stated that "during [his] tenure, that has happened not an enormous amount, but it has happened before." J.A. 469. Moreover, Russell and Lioi stated repeatedly that the turn-ups revealed that Williams was not staying at his residence; that they did not know his precise whereabouts; that they

35

repeatedly encouraged him to turn himself in; and that they wanted to keep him communicating and cooperating with them rather than go silent, so they were willing to have him return to self-surrender.

To recap, the record demonstrates at most that Russell had the arrest warrant "pulled" and routed to the Eastern District. But the record does not support either Robinson's or the dissent's remaining characterizations of Russell's behavior during the events in question. When comparing this proper view of the record against what is required to survive summary judgment, Robinson has not proffered sufficient evidence to show that a jury could find that Russell's conduct created or increased any danger to Mrs. Williams. Russell could not create a pre-existing danger. *See Doe*, 795 F.3d at 439. Nor would his "act" of pulling the warrant to the Eastern District be the sort of conduct that could render him liable under the state-created danger theory. Not every act that could possibly "make[] injury at the hands of a third party more likely" gives rise to liability, only acts that are "more akin to . . . directly causing harm" to Mrs. Williams would do so. *Pinder*, 54 F.3d at 1175, 1177. Russell's decision had only the sort of "downstream, but-for connection [that] simply stretches the 'affirmative acts' concept too far." *Doe*, 795 F.3d at 442. As such, this cannot be the basis of a state-created danger due process claim against Russell.

## C. Lioi and Russell's Decisions to Allow Williams to Leave the Eastern District Office and Self-Surrender "After the Weekend" Cannot Support Liability

What remains is Robinson's reliance on Lioi and Russell's decisions relating to Williams' attempted and agreed-to self-surrenders.[16] Given the evidence that developed at discovery, Robinson's argument concerning these events merely recharacterizes inactions or omissions related to executing a misdemeanor arrest warrant, conduct that makes this case indistinguishable from *Town of Castle Rock*, *DeShaney*, *Pinder*, and *Doe*.

Given the "narrow limits . . . to establish § 1983 liability based on a state-created danger theory," it is unsurprising that plaintiffs often attempt to recharacterize inactions and omissions as affirmative acts to satisfy their pleading and proof obligations. *Doe*, 795 F.3d at 439. What is more, we have previously cautioned that "courts should resist the temptation" to accept plaintiffs' attempts to "artfully recharacterize[ ]" inaction as action. *Pinder*, 54 F.3d at 1176 n.*.

In *Pinder*, we observed that a plaintiff brought "purely an omission claim" when she argued that a police officer had affirmatively acted to enhance the danger posed by her ex-boyfriend when the officer reassured her that the ex-boyfriend would be "locked up overnight," but then decided to charge the ex-boyfriend with less serious offenses that

---

[16] This discussion relates to Robinson's first, second, fifth, and eighth (in part) "affirmative acts," namely: that Lioi (1) allowed Williams to leave the Eastern District station instead of detaining him when the warrant could not be readily located; (2) allowed Williams to self-surrender after the weekend even though the arrest warrant was located early Friday morning; (5) did not assign officers to execute the arrest warrant once it was located and did not return the arrest warrant to Central Records for logging; and that Russell (8) allowed Williams to self-surrender after the weekend even though the arrest warrant was located early Friday morning.

resulted in his immediate release. *Id.* at 1172, 1176. That decision proved fatal, as it allowed the ex-boyfriend to return to the plaintiff's home and set it on fire, resulting in the deaths of the plaintiff's three children. *Id.* at 1172.

In analyzing the plaintiff's state-created danger claim, we explained that "[n]o amount of semantics can disguise the fact that the real 'affirmative act' here was committed by" the ex-boyfriend, not by the officer. *Id.* at 1175. "[T]he state did not 'create' the danger, it simply failed to provide adequate protection from it," meaning that, at most, the state actors "stood by and did nothing when suspicious circumstances dictated a more active role." *Id.* (internal quotation marks omitted). We held that the officer's conduct could not support a claim and further cautioned that were we to accept the plaintiff's definition of an "affirmative act," "every representation by the police and every failure to incarcerate would constitute 'affirmative actions,' giving rise to civil liability." *Id.*

A decade after our decision in *Pinder*, the Supreme Court reiterated that "the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its 'substantive' manifestations." *Town of Castle Rock*, 545 U.S. at 768. As often occurs in this type of case, *Town of Castle Rock* arose out of "horrible" circumstances—a woman obtained a restraining order against her husband, but the order gave him the right to visit the home to have limited interaction with the couple's three children on alternating weekends and, "upon reasonable notice," allowed for a "midweek dinner visit." *Id.* at 751–52 (internal quotation marks omitted). Without any notice or

38

coordination with his wife, the husband took his daughters from the home early on a weekday evening. *Id.* at 753. When she discovered their absence, the wife called the police and asked them to enforce the restraining order. *Id.* The police "refused to do so," telling her to wait until 10:00 p.m. to see if the husband returned the girls home. *Id.* (internal quotation marks omitted). She called the police again at 10:00 p.m. because they had not returned, and the police told her to wait until midnight. *Id.* She called a third time shortly after midnight, then went to her husband's apartment and found it empty, called the police again, and was told to wait for a police officer to arrive. *Id.* When no officer arrived, she went to the police station to file a report. *Id.* at 753–54. "The officer who took the report made no reasonable effort to enforce the [restraining order] or locate the three children. Instead, he went to dinner." *Id.* at 754 (internal quotation marks omitted). About two hours later, the husband appeared at the police station and opened fire. *Id.* After the husband was killed, police discovered that he had already murdered his three daughters. *Id.*

The Supreme Court rejected the wife's claim that the police officers violated the Due Process Clause by "fail[ing] to respond properly to her repeated reports that her estranged husband was violating the terms of a restraining order." *Id.* at 751. It observed that, despite the language mandating enforcement of the restraining order, "[a] well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes." *Id.* at 760. The Supreme Court noted that even if enforcement was mandatory, "that would not necessarily mean that" a private citizen has an "entitlement" to the enforcement of such an order. *Id.* at 764–65. And, in any event, the Court

39

concluded that any such right under state law would not necessarily "constitute a 'property' interest for purposes of the Due Process Clause." *Id.* at 766. Consequently, the wife "did not, for purposes of the Due Process Clause, have a property interest in police enforcement of the restraining order against her husband." *Id.* at 768. In so holding, the Court cautioned that the Fourteenth Amendment should not be treated "as a font of tort law." *Id.* (internal quotation marks omitted); *see also Slaughter*, 682 F.3d at 323 (discussing the dangers of constitutionalizing ordinary state tort claims).

At its core, Robinson's claim suffers the same fundamental problem identified in *Town of Castle Rock*, *DeShaney*, *Pinder*, and *Doe*—an attempt to turn inactions and omissions into affirmative acts and to convert what might be a basis for state tort liability into a federal constitutional violation. As the Supreme Court recognized in *Town of Castle Rock*, even mandatory language in a temporary restraining order—or, here, an arrest warrant—does not strip police officers of enforcement discretion. When Lioi and Russell allowed Williams to self-surrender, they were exercising the long tradition of police discretion concerning the circumstances of enforcing a misdemeanor arrest warrant. *See Town of Castle Rock*, 545 U.S. at 760–61. Exercising this sort of routine police discretion does not give rise to a state-created danger. *Id.* To hold otherwise would turn the thousands of instances where the police agree to allow a charged individual to self-surrender into a conspiracy to evade arrest. No precedent countenances such a reading.

The record reveals the rest of Lioi and Russell's conduct is properly characterized as inaction or omission. For instance, Robinson challenges Lioi's failure to make

different decisions when the warrant could not be located after Williams attempt to self-surrender. She further seeks to hold both officers liable for failing to execute the arrest warrant earlier rather than allowing Williams to self-surrender later. Neither of these claims is any different than the claims rejected as mere failures to act on the abuse reports in *DeShaney* and on the failure to enforce the restraining order in *Town of Castle Rock*.

As we observed in *Pinder*, the state does not "commit[ ] an affirmative act [for purposes of the state-created danger doctrine] . . . every time it does anything that makes injury at the hands of a third party more likely," and the Due Process Clause does not require state actors to protect individuals from the harms they face from third parties. 54 F.3d at 1175 (internal quotation marks omitted); *accord Estate of Smithers ex rel. Norris v. City of Flint*, 602 F.3d 758, 764 (6th Cir. 2010) (holding police officers not liable under state-created danger doctrine where they arrested an individual and allowed her to leave rather than detaining her on that charge because that exercise of discretion "did not constitute an affirmative act" and did not increase the danger to the victims); *Burella v. City of Phila.*, 501 F.3d 134, 146–47 (3d Cir. 2007) (holding police officers not liable under state-created danger doctrine where they did not enforce a court order or follow state law requiring the perpetrator's arrest because what the plaintiff "actually contend[ed] [was] that the officers failed to act," which is not cognizable).

The affirmative act that caused Mrs. Williams' injury was Williams' decision to stab her; "[n]o amount of semantics can disguise [that] fact." *Pinder*, 54 F.3d at 1175; *see Doe*, 795 F.3d at 441 (holding that a state actor's decision not to report a known concern is the same as an "officer's decision not to file . . . more serious charges," both of which

41

constitute nonactionable omissions). In short, these circumstances do not give rise to liability under the Due Process Clause. Notably, neither Robinson nor the dissenting opinion cites a single case where an officer's failure to serve a misdemeanor arrest warrant or decision to allow an individual to self-surrender constituted an "affirmative act" establishing liability under the state-created danger theory. Nor could they do so, as such acts fail to meet the high standard of being "akin to [the state] actor itself directly causing harm to" Mrs. Williams. *Cf. Pinder*, 54 F.3d at 1177.

Our reliance on *Town of Castle Rock* and conclusion that many of Robinson's arguments are based on facts that are properly characterized as omissions or failures to act do not constitute an "about-face," *infra* at 64, from our prior decision. We previously recognized the Supreme Court's holding in that case that police officers have discretion in such enforcement and service decisions and cannot be liable for exercising that discretion because individuals do not have a property interest in such police enforcement. *Robinson*, 536 F. App'x at 345. We held that Robinson's allegations were distinguishable from *Town of Castle Rock*, however, because "Lioi's alleged conduct . . . was *not confined to* a failure to execute the arrest warrant" given that Robinson alleged that he "*affirmatively acted to interfere with execution of the warrant by conspiring* with Cleaven Williams to evade capture and remain at large." *Id.* (emphases added). But after discovery, Robinson has marshaled evidence supporting only conduct that *is* confined to a failure to execute the warrant.

For example, Robinson has presented no evidence to support her allegation that Lioi (or Russell) conspired with Williams to evade arrest by preventing the "proper"

42

domestic violence unit from serving the warrant. To the contrary, the Eastern District officers had the authority to arrest Williams and were responsible for the neighborhood where Williams lived. And while the Complaint alleged that Lioi (or Russell) warned Williams about the existence of the arrest warrant, the record now shows that *Williams contacted Russell* about its possible existence. The Complaint also alleged BCPD officers feigned attempts to serve the arrest warrant, but the record contains no such evidence. And perhaps most importantly, the record lacks evidence to substantiate the Complaint's allegation that Lioi *lied* about not knowing where the warrant was on the evening of Williams' attempted self-surrender or that he falsified information to avoid having to arrest Williams that night. None of those allegations in the Complaint, which were the subject of the motion to dismiss and our prior decision, are borne out by evidence at the summary judgment stage.

Instead, Robinson has presented only recharacterizations of acts that amount to a simple failure to arrest: Lioi allowed Williams to leave the Eastern District rather than detaining him until the warrant—which was in fact missing and which he had been told may be at a location that was closed for the night—was found; that Lioi and Russell did not aggressively pursue Williams' arrest after the warrant was located; and that they agreed to allow him to self-surrender after the weekend. For the reasons stated, all of those "acts" are appropriately characterized as omissions and failures to act, not the sort of affirmative acts originally alleged that would distinguish this case from *Town of Castle Rock*, *DeShaney*, *Pinder*, and *Doe*.

Robinson's arguments concerning these events fail for the additional reason that none of Lioi's or Russell's decisions occurred in "the context of immediate interactions between the [state actor] and" Mrs. Williams. *See Doe*, 795 F.3d at 441 (alteration in original) (internal quotation marks omitted). In *Pinder*, this Court cautioned that not "every representation by the police and every failure to incarcerate . . . constitute[s] [an] 'affirmative action[ ],' giving rise to civil liability." 54 F.3d at 1175. We concluded that the state's conduct constituted a "fail[ure] to provide adequate protection from" a third party's danger, which is not cognizable, even though the officer in that case explicitly reassured the plaintiff that he would charge the ex-boyfriend with an offense that would keep him detained overnight and then failed to do so. *Id.*

Here, no evidence shows that Mrs. Williams or anyone else on her behalf ever approached Lioi or Russell to seek protection from her husband. And the arrest warrant, which simply charged Williams with second-degree assault and named Mrs. Williams as the victim, would have provided scant additional information to a reviewing officer. J.A. 764. Contrary to the dissent's assertion, there's no basis to believe that the officers knew that Mrs. Williams was "afraid" of her husband, but even that would not be enough on its own to establish liability for decisions based on that knowledge. *See Pinder*, 54 F.3d at 1172 (holding no liability under the state-created danger doctrine for the officer's conduct reassuring the plaintiff of her safety and charging the former boyfriend on lesser charges than he'd promised after having responded to a domestic disturbance call and hearing the plaintiff express fear for herself and her children in light of the boyfriend's abusive and violent conduct and death threats that occurred on the same night). The lack of direct

44

contact between the victim and the officers prevents any conclusion that the officers affirmatively acted and thereby increased the danger to Mrs. Williams. Indeed, this case involves almost no personal knowledge on the part of Lioi or Russell that Williams posed a threat—let alone an ongoing, immediate, or increasingly violent threat—toward Mrs. Williams. In that regard, it is akin to *Doe*, where the record did not show that the defendant met or spoke with the plaintiffs and he "could only speculate that the . . . allegations were true and that [the third party] would pose future danger" to the plaintiffs. 795 F.3d at 441. We observed that this fact—which is also present in this case—meant that the case "st[ood] on weaker ground than" the *DeShaney* claim, where the defendants "knew the child victim and were aware of the specific danger the father posed to him." *Id.* at 441–42. Even in *Pinder*, where the defendant had also spoken directly with the plaintiff and had specific and immediate knowledge of the risk the third party posed to the plaintiff and her children, the defendant was not liable. 54 F.3d at 1172. Accordingly, even in the face of much closer interactions between the plaintiff (or victim) and the defendant(s), there was no liability. Here, Lioi and Russell had no "immediate interactions" with Mrs. Williams, so this case is on even weaker ground. *Id.* at 1176 n.*.

Lastly, we note that the record also lacks evidence demonstrating the requisite causal link to Mrs. Williams' death. As the district court noted, the officers proffered an expert witness who opined, given his experience regarding arrests made on the charges against Williams and his background, that Williams would have been free well before Monday afternoon and could have committed the offense even if he were detained when he attempted to self-surrender or if he were arrested earlier. J.A. 128. Williams would

have been arrested and detained for only a limited time, then released pending further proceedings. Moreover, there's evidence that even if Williams was not aware of his wife's location at all times during the events in question, he did know where she was at other times besides her courthouse appearance. *E.g.*, J.A. 818, 834. Accordingly, he could have committed the crime on more than one occasion.

Because the evidence concerning these events does not support Robinson's characterization of them as "affirmative acts" creating or increasing a risk to Mrs. Williams, the record does not support a claim under the state-created danger doctrine.

## IV.

The above analysis demonstrates why Robinson failed to come forward with sufficient evidence to support her claim that Mrs. Williams' constitutional rights were violated under the state-created danger theory of liability. That same analysis conclusively demonstrates why Lioi and Russell are also entitled to qualified immunity, which "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Lawson v. Union Cty. Clerk of Court*, 828 F.3d 239, 249 (4th Cir. 2016). Because the evidence was insufficient to support a finding that Lioi and Russell violated Mrs. Williams's constitutional rights, it follows that the district court properly concluded that they were entitled to qualified immunity.

Nonetheless, even if the facts proven during discovery set out a constitutional violation, Lioi and Russell would still have been entitled to qualified immunity because

46

that right was not clearly established. Once again, we note that our consideration of this legal question is governed by the changes in the facts developed during discovery as opposed to those that had been alleged in Robinson's Complaint. We previously affirmed the denial of qualified immunity at the motion to dismiss stage because we accepted Robinson's allegations concerning Lioi's conduct, including the allegations that Lioi actively interfered with the execution of the warrant by lying about not being able to find it on the evening Williams attempted to self-surrender, feigned the BCPD's efforts to arrest Williams, and conspired with him to remain free despite multiple opportunities to arrest him. Based on those allegations we concluded that

> in 2008, a reasonable police officer in Lioi's position would have known that a law enforcement officer affirmatively acting in a conspiracy with a third party to avoid arrest on assault charges could give rise to a constitutional violation when the third party acts in furtherance of the conspiracy to injure another person.

*Robinson*, 536 F. App'x at 347.

As already described at length, the evidence does not allow for the conclusion that Lioi or Russell were lying about the warrant being missing or their inability to serve the warrant. Instead, the record shows that—at most—they agreed to allow a cooperating individual that posed no known immediate risk to self-surrender. And it was not clearly established in 2008 that a decision to allow self-surrender rather than aggressively serve a misdemeanor arrest warrant would serve as a basis of liability under the state-created danger doctrine. Indeed, no case then or now could be taken to stand for that proposition.

"A right is clearly established when the contours of the right are sufficiently clear that a reasonable officer would understand that what he is doing violates that right."

*Pinder*, 54 F.3d at 1181. To be sure, *DeShaney* and other cases have acknowledged the existence of the state-created danger theory of liability to establish a due process violation. But in determining whether a right is clearly established, courts do not look at the right "at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir. 1994). Although there does not need to be a case identical to the facts of a particular case for the right to be clearly established, there must be a reasonable correlation. *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999). Put simply, a reasonable officer must have been able to ascertain the "apparent" unlawfulness of his conduct "in light of the pre-existing law." *Pinder*, 54 F.3d at 1173.

Applying these principles here, while a reasonable officer in 2008 would have notice that the state-created danger theory existed in the abstract, no Supreme Court or Fourth Circuit case law would have described when its requirements had been met in *any* particular set of circumstances. Instead, officers would have recognized multiple cases setting forth the general framework that, to be held liable under this doctrine, an officer had to engage in conduct that created or increased "the dangerous situation that resulted in a victim's injury" such that the circumstances were "much more akin to an actor . . . directly causing harm to the injured party." *Pinder*, 54 F.3d at 1177. But they would have encountered no cases discussing the state-created danger doctrine in the context of serving an arrest warrant. Nor would they have encountered any cases holding an officer liable under the doctrine for harm that arose from an officer's decision to allow a party named on an arrest warrant to self-surrender. The absence of case law in this area coupled

48

with the Supreme Court's statements in *Town of Castle Rock* regarding police discretion executing a warrant means that Lioi and Russell did not have "fair warning that their conduct was unconstitutional" even if we were to conclude that a violation occurred in this case. *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008). In sum, as the district court held, "[a] reasonable police officer in Lioi and Russell's position could not have known that the failure to guarantee [Williams'] arrest on a misdemeanor warrant prior to [the date of his wife's death] would violate [Mrs. Williams'] constitutional rights." *Robinson*, 2017 WL 2937568, at *10. Lioi and Russell are entitled to qualified immunity for this additional reason as well.

## V.

Both Robinson and the dissenting opinion contrive to create a genuine issue of material fact through the officers' omissions and "mere speculation or the building of one inference upon another," *Barwick*, 736 F.2d at 963. To survive summary judgment, Robinson had to "do more than present a scintilla of evidence in [her] favor." *Sylvia*, 48 F.3d at 818 (internal quotation marks omitted). She had to present "sufficient evidence such that reasonable jurors could find by a preponderance of the evidence" for her. *Id.* (internal quotation marks omitted). But Robinson's version of events is not supported by sufficient evidence to permit a reasonable jury to conclude that Lioi or Russell undertook any affirmative acts that would support liability for a state-created danger substantive due

49

process claim. *See id.* As such, she has not shown that the district court erred in granting

the officers summary judgment.[17]

For the reasons stated, the judgment of the district court is

*AFFIRMED.*

---

[17] Although Robinson's appeal centers on the § 1983 claim, she also challenges the district court's decision to grant summary judgment to Lioi and Russell on her state claims of gross negligence, wrongful death, and survival. Those claims are meritless, and we affirm the district court's judgment on them for the reasons set out in the district court's opinion. *Robinson*, 2017 WL 2937568, at *11–14.

GREGORY, Chief Judge, dissenting:

In our previous decision in this case, we held that Appellants had sufficiently alleged that Appellee Deputy Major Daniel Lioi is liable for violating Veronica Williams's due process rights because he acted affirmatively to create or enhance the danger that she faced at the hands of her husband. Although Appellants have now come forward with evidence to support their section 1983 due process claim, the majority has abandoned our prior ruling. The majority now takes the view that the police officers' conduct amounts, as a matter of law, to nothing more than a failure to act, which is not actionable under a state-created danger theory. In so holding, the majority not only dismisses the law of this case but also takes great pains to construe the evidence that has since been developed in the improper light.

At bottom, Appellants have shown that Deputy Lioi and Major Melvin Russell took affirmative steps to allow Cleaven Williams—a community leader and their acquaintance—to evade arrest until a date deemed most convenient by him, a date after he was able to fatally stab his wife. Although the officers did not know that Williams would kill his wife, they were well aware of the domestic assault charges pending against him and that his wife was afraid of him. The officers' conduct amounts to more than mere negligence, and a jury could find true the complaint's allegations—allegations we have said amount to a constitutional violation. Therefore, I respectfully dissent.

# I.

Before I explain my disagreement with the majority, I believe it is important to review the facts of this case in the light most favorable to Appellants, the parties that did not move for summary judgment.

In 2008, Williams resided in Baltimore with his wife, Veronica Williams. Williams served as the president of the Greater Greenmount Community Association. J.A. 241. Through his affiliation with the Association, Williams met members of the Baltimore City Police Department's Eastern District, including Deputy Lioi and Major Russell. J.A. 439, 444. Major Russell and Williams interacted with each other during community meetings and community walks. J.A. 441. The two men also exchanged text messages at times. J.A. 453.

Williams and his wife were having problems. During one community event, Williams confided in Major Russell that he had concerns about the fact that his wife was a Jehovah's Witness and was instilling her beliefs in their children. *Id.* Things apparently escalated, and in October 2008, Williams pinned down his wife and cut off her hair. The following month, Mrs. Williams sought a protective order against her husband based on the October assault.

At some point during the weekend of November 8, 2008, Williams called Major Russell to determine whether "it was actually true" that his wife had "got some papers on him." J.A. 706. On November 9, Mrs. Williams obtained a temporary protective order against her husband, and a warrant issued for Williams's arrest.

Officer Jose Arroyo was dispatched from the Eastern District to pick up the arrest warrant from the Court Commissioner's office. J.A. 549, 580, 585. Although police department policy requires that an arrest warrant be forwarded directly from the Court Commissioner to Central Records for processing, Arroyo did not take the warrant to Central Records and instead returned directly to the Eastern District. J.A. 581, 589. Arroyo could not recall if his superior officers, including Deputy Lioi and Major Russell, ordered him to bypass the Court Commissioner. J.A. 578–79. Nonetheless, Arroyo testified in deposition that the only circumstances under which he would not have taken a warrant to Central Records were (1) if he were ordered not to, or (2) if an officer had the suspect in custody already and was transporting the suspect to Central Booking. J.A. 577–78. It is undisputed that no police officer had Williams in custody at the time.

On Monday morning, November 10, Williams sent Major Russell a text message saying, "Call me, major." J.A. 99. Also that day, Officer Adrienne Byrd—the officer assigned to Williams's area—approached Major Russell about the warrant, which she had in hand. J.A. 445, 450, 707. Although Major Russell was not typically informed about every warrant that issued in his district, Officer Byrd "thought it was important to bring [this warrant] to [his] attention." J.A. 450. Major Russell "glossed over the warrant, read the warrant," and "saw it was for [Williams]." J.A. 451.

The next day, Tuesday, November 11, Major Russell called Williams and told him that he should turn himself in, but to not "come in later in the week, like on a Friday or something, because you don't want to sit in jail the entire weekend, but you need to get in as soon as possible." J.A. 707. This advice was far from typical. J.A. 277–78.

53

On Wednesday, November 12, Williams texted Major Russell, saying, "I would really like 2 do it on Tuesday . . . I am still trying to get capital . . . I only have 3000 right now . . . I have some favors coming though." J.A. 100. Later that afternoon, however, Major Russell told Deputy Lioi that Williams was "scheduled" to turn himself in the following day, Thursday, November 13, at 9:00 p.m. J.A. 249. Major Russell was working the day shift, which ended around 5:00 p.m., and it was Deputy Lioi who worked the night shift. J.A. 248–49. According to Deputy Lioi, Major Russell instructed him to be at the Eastern District when Williams came to turn himself in "to make sure the process [went] well." J.A. 288. Major Russell's request was unusual; Deputy Lioi had not arrested anyone "since the late '90s." J.A. 467. Yet, because Williams was a community leader, Major Russell wanted his second-in-command to be there. *Id.* In fact, Deputy Lioi interpreted Major Russell's request for his presence to mean that he was to ensure the process went "smoothly" for Williams because Williams was a community leader, he "was different." J.A. 288.

Meanwhile, between November 9 and 13, Eastern District officers may have attempted to serve the arrest warrant at Williams's house during unannounced "turn-ups." J.A. 707. Major Russell testified that he drove by Williams's home one night but that it was "blacked out, darked out." J.A. 451. Deputy Lioi acknowledged that it was possible the turn-ups were not conducted. J.A. 341. And Officer Byrd—whose job it was to serve the warrant—could not recall ever going to Williams's area to serve the warrant. J.A. 106, 451. In fact, after she had brought the warrant to Major Russell's attention on November

54

10, "[i]t was, like [she] had the paperwork in [her] hand, and then the paperwork just disappeared. Someone took it from [her]." J.A. 108.

On November 13, at approximately 1:00 p.m., Williams sent Major Russell a text message advising, "I am running bhind. I should b there n 15." J.A. 101. Major Russell responded, "K." *Id.* When asked in deposition about this text exchange, Major Russell answered that he believed Williams was referencing his intent to turn himself in during Major Russell's shift. J.A. 480. As Major Russell explained, he did not meet with Williams, or make any arrangement to meet with Williams, apart from Williams's self-surrender. J.A. 481.

Williams, in fact, did not appear at the Eastern District in the afternoon of November 13. Rather, he arrived at the district around 9:00 p.m. on that day. J.A. 257. Deputy Lioi—who was certain the warrant had issued—called Central Records and was told they did not have the warrant. J.A. 257–58. This was the first time in Deputy Lioi's twenty-year law enforcement career that a warrant existed for someone whom Central Records was unable to locate in the system. J.A. 289–90. Deputy Lioi then began a brief search for the warrant. J.A. 562. He contacted the Court Commissioner, the North Avenue Courthouse, and the Baltimore City Sheriff's Office. *Id.* Deputy Lioi was told by the Court Commissioner that a warrant had issued and could be at the courthouse, which was closed for the night. J.A. 334, 562, 631. Deputy Lioi also left a voicemail message for Major Russell. J.A. 268. Deputy Lioi had no doubt that the warrant existed and could have arrested Williams without the physical warrant. J.A. 234, 258. And although Central Booking would not put Williams in a cell without the physical warrant, the Eastern District had a "hot box" in

55

which Deputy Lioi could have detained Williams for up to eight hours while "every absolute effort was made to locate the warrant" or overnight until the courthouse opened the next morning. J.A. 252, 456–57.

Deputy Lioi, however, did not hold Williams in the hot box. Instead, he allowed Williams to wait in a public "desk area" of the station. J.A. 259–60. And rather than make "every absolute effort" to locate the warrant, Deputy Lioi searched for the warrant for a mere 20 to 30 minutes and, after not immediately finding it, let Williams leave the precinct. He told Williams that officers would contact him after the warrant was located and would then either "have him picked up" or arrange for Williams to turn himself in. J.A. 257–58. Deputy Lioi did not ask Williams about where he was staying or otherwise confirm that officers would be able to locate him after the warrant was found.

After Deputy Lioi let Williams leave, Major Russell returned his call. J.A. 268. Deputy Lioi explained to Major Russell that Williams had come to the station and that Deputy Lioi let him leave because he could not locate the warrant. *Id.* Major Russell then told Deputy Lioi that the warrant had been "pulled." *Id.* Major Russell also suggested that Deputy Lioi search Officer Byrd's patrol car. J.A. 456, 458. Deputy Lioi called Officer Byrd, as Major Russell had told Deputy Lioi that she had the warrant. *Id.* Officer Byrd recalled receiving paperwork for Williams from either her supervisor or the person giving

"roll call."[1] J.A. 105. However, as described earlier, she could not recall what happened to that paperwork, only that someone had taken it from her. J.A. 108.[2] The warrant was found in the window visor of Officer Byrd's patrol car in the early morning hours on Friday, November 14, about two hours after Williams left the station. J.A. 269, 283.

Rather than immediately contact Williams after the warrant was found, Deputy Lioi did not speak with Williams until after 7:00 p.m. on that day—over twelve hours later. J.A. 284. Williams asked if he could turn himself in after the weekend. J.A. 277. Williams explained to Deputy Lioi that he had "some issues," including that his mother was moving

---

[1] As Officer Byrd explained, "when you are in roll call, they give you like the information that's on your post." J.A. 105.

[2] The majority cites to an affidavit of Sergeant Todd Tugya that recounts the details of a conversation Sergeant Tugya had with Officer Byrd during the search for the warrant. Maj. Op. at 9. Those statements are inadmissible hearsay. *See* Fed. R. Evid. 802. Although the majority suggests that the statements are admissible to show the effect of Officer Byrd's remarks on Sergeant Tugya's search for the warrant, Maj. Op. at 34 n.15, the majority cites to the statements for their truth—that Officer Byrd had the warrant, had attempted to serve it, and had left it in the visor of her patrol car, *id.* at 9. Because of this, I do not believe that an exception to the rule against hearsay applies, and the majority improperly considers Sergeant Tugya's affidavit. *See* Fed. R. Civ. P. 56(c); *U.S. Dep't of Hous. & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.*, 64 F.3d 920, 926 (4th Cir. 1995) ("[H]earsay, like other evidence inadmissible at trial, is ordinarily an inadequate basis for summary judgment."); *see also Niblock v. Mercedes Benz Credit Corp.*, 134 F.3d 363 (Table), No. 97-1229, 1998 WL 27153, at *4 (4th Cir. Jan. 27, 1998) (affirming district court's determination that affidavit did not contain "competent, admissible evidence" because its statements were inadmissible hearsay).

Even if Sergeant Tugya's affidavit statements were admissible, they are contradicted by Officer Byrd's deposition testimony that after her conversation with Major Russell three days earlier, someone took the warrant from her hand and it "disappeared." J.A. 108. The affidavit also contradicts Officer Byrd's testimony that she first became aware that the warrant was located in her patrol car during her deposition in this case. J.A. 107. By portraying the facts related to Officer Byrd's possession of the warrant in the light least favorable to Appellants, the majority ignores the contradictory evidence and flips the summary judgment standard on its head.

out of town. *Id.* Williams was concerned that, as he had been warned by Major Russell, if booked on Friday, he could be in custody all weekend. *Id.* Deputy Lioi conferred with Major Russell, who confirmed that "after the weekend's fine." *Id.* Deputy Lioi then arranged for Williams to self-surrender on the following Tuesday. *Id.* As Deputy Lioi later explained to internal affairs, "We knew him. I felt confident that we would be able to find him." J.A. 563. This was Deputy Lioi's explanation despite the fact that officers had up to that point allegedly been unable to locate Williams to serve the warrant.

Also on Friday, Deputy Lioi, at Williams's request, wrote a letter stating that Williams had been "very cooperative and willing to turn himself in," that the Eastern District verified that a warrant for second degree assault was open, and that the warrant was not at Central Records but rather "was being held at North Avenue Court House, which was closed for the night" of November 13, when Williams had attempted to self-surrender. J.A. 285, 631. This letter was written after the warrant had in fact been located at the Eastern District, yet the letter made no mention of the warrant having been found. In a text message to Deputy Lioi, Williams also asked that Deputy Lioi "leave off the Tuesday part . . . thats [*sic*] just for us . . . I just wanted an overview of the night . . . not too much detail." J.A. 686. Deputy Lioi complied. He omitted any information about Williams's scheduled self-surrender. J.A. 631.

After Deputy Lioi provided the letter to Williams, Williams texted Deputy Lioi: "Thank you Dan. There is a method to my madness:-/" J.A. 101. Deputy Lioi responded, "That's what I'm afraid of," to which Williams wrote, "Its [*sic*] cool:-)" *Id.*

58

Deputy Lioi wrote back, saying "I trust u." J.A. 692. Williams then wrote, "Thanks . . . we both have shown good favor." J.A. 693.[3]

On Sunday, November 16, Williams informed Deputy Lioi that his attorney had located a different assault warrant from March 7, 2003, that was issued for a Maryland resident named Cleaven Williams. J.A. 285–86.[4] Deputy Lioi contacted Central Records' "hot desk" and confirmed that there was an outstanding warrant for a Cleaven Williams. J.A. 286. The warrant was for a black male with the address of 2928 Ruskin Court, Abingdon, Maryland. J.A. 632. The warrant contained no further identifying information, such as date of birth, height, or weight. J.A. 286, 632. And as Williams explained, his father was also named Cleaven Williams. J.A. 809. At Williams's request, Deputy Lioi sent him an email confirming the existence of the March 7, 2003, warrant for first-degree assault and asserting that "[t]he information in the Criminal System Inquiry Case History Display in reference to the subject of the warrant is very limited and should not be considered to be you based on the name alone." J.A. 632. The record does not show that Deputy Lioi conducted any investigation into the 2003 warrant, even though he acknowledged in deposition that he could have contacted the 2003 complainant or the jurisdiction that sought the 2003 warrant to confirm the identify of that Cleaven Williams. J.A. 288.

---

[3] When asked in deposition about whether he would have issued a similar letter for someone that Lioi did not know personally, Lioi responded, "[p]robably not, no." J.A. 288.

[4] The 2003 warrant was based on an incident in which Williams fired a gun into a car. J.A. 308.

Deputy Lioi had never written such letters before in his twenty years of law enforcement experience. J.A. 287–88. However, this was an "unusual circumstance based on the fact that we knew this guy as a community leader." J.A. 287. It was later determined that Williams was in fact the subject of the 2003 warrant. J.A. 287–88.

On Monday, November 17, Williams and Deputy Lioi exchanged the following text messages:

> Williams: Cool . . . I just left my home 2 meet w/ my lawyer . . . I saw my wife drive by . . . can I go home or what?
>
> Lioi: I wouldn't be alone with her. She could say you did anything. Have a witness with you if you meet.
>
> Williams: Thanks Dan.
>
> Williams: Can she do another protection order & try 2 keep me from the house?
>
> Lioi: She could, I would avoid her. She could call the police and say u have the warrant and she is afraid of you. It would force our hand to serve the warrant.

J.A. 700–05. At some point after the text message exchange, at around 1:00 or 2:00 p.m. that day, Williams called Deputy Lioi from his attorney's office. J.A. 291. Deputy Lioi encouraged Williams to turn himself in that same day, rather than wait until the following day. *Id.* Williams commented that Tuesday, the prearranged date, was "still better." *Id.* At the end of the conversation, Deputy Lioi told Williams to call him after he left his attorney's office. *Id.*

Deputy Lioi had the warrant with him at that time. J.A. 305. The parties point to no evidence in the record showing that Deputy Lioi ever logged the warrant with Central Records after it was found the previous Friday; instead, it appears that Deputy Lioi kept

the warrant with him. Although Deputy Lioi knew where Williams was, he again did nothing to serve the warrant.

Also on November 17, the Maryland District Court for Baltimore City held a final protective order hearing on Mrs. Williams's petition. At around 3:00 p.m., Deputy Lioi called Williams back, having not heard from him after Williams left his attorney's office. J.A. 291. Williams answered the phone and said, "hey, let me call you back." *Id.* Approximately forty minutes later, Mrs. Williams, who was pregnant, left the courthouse. Outside of the courthouse, Williams stabbed her multiple times in the face, head, and neck. She miscarried and died in the hospital on November 21, 2008. Williams was convicted of murder and is currently serving a life sentence. *State v. Williams*, No. 108350013 (Cir. Ct. Balt. City Feb. 25, 2011); *State v. Williams*, No. 11-0672 (Ct. Spec. App. Apr. 5, 2013) (affirming conviction).

## II.

"Section 1983 imposes liability on state actors who cause the 'deprivation of any rights, privileges, or immunities secured by the Constitution.'" *Doe v. Rosa*, 795 F.3d 429, 436 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 811 (2016). Those rights include the right under the Fourteenth Amendment's Due Process Clause to be free from "conduct that deprives an individual of bodily integrity." *Id.* at 436–37. Although "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989), an exception to this rule exists "[w]hen the state

61

itself creates the dangerous situation that resulted in a victim's injury," *Doe*, 795 F.3d at 438 (quoting *Pinder v. Johnson*, 54 F.3d 1169, 1177 (4th Cir.) (en banc), *cert. denied*, 516 U.S. (1995)).  This exception, the state-created danger exception, applies where a state official's affirmative act created or enhanced the danger to the individual.  *Pinder*, 54 F.3d at 1175.

## A.

As an initial matter, I take issue with the majority's easy disregard of our prior opinion in this case.  We are not merely presented for a second time with the argument that members of the Baltimore City Police Department created or enhanced the danger to Mrs. Williams and are thus liable for violations of the Due Process Clause.  Rather, we are tasked with applying what we have already established as the law of this case to the facts that have been developed since the last appeal.  In the previous appeal, we considered the sufficiency of Appellants' allegations against Deputy Lioi.  *Robinson v. Lioi*, 536 F. App'x 340 (4th Cir. 2013), *cert. denied*, 572 U.S. 1002 (2014).[5]  In those allegations—allegations which survived a Rule 12(b)(6) motion to dismiss—Appellants asserted that Deputy Lioi "conspired with Cleaven Williams 'to evade capture' and 'to remain free despite the finding of probable cause,' thereby directly enabling him to harm Mrs. Williams."  *Id.* at 344.  We affirmed the district court's denial of Deputy Lioi's motion to dismiss, determining that Deputy Lioi's alleged actions—actively interfering with execution of the warrant by failing to turn the warrant over to the appropriate unit,

---

[5] Appellants' claims against Major Russell were brought after our decision affirming denial of the motion to dismiss the claims against Deputy Lioi.

warning Williams, giving Williams advice about how to avoid service, and falsely stating the warrant could not be found—were affirmative acts that created or enhanced the danger to Mrs. Williams. *Id.* at 344, 346.

In so holding, we rejected Deputy Lioi's argument that "because a police officer has discretion in the execution of arrest warrants, his conduct in this case did not violate Veronica Williams' substantive due process rights." *Id.* at 345 (citation omitted). Critically, we found that the Supreme Court's decision in *Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748 (2005), was not controlling. *Id.* In *Town of Castle Rock*, a mother of three filed suit against the town of Castle Rock, Colorado, alleging a violation of the Due Process Clause when the police did nothing to respond to requests to enforce a restraining order against her husband who later killed her daughters. 545 U.S. at 751, 753–54. The Court held that the mother had no property interest in the enforcement of the restraining order because there was no "legitimate claim or entitlement to it" where government officials retained discretion over enforcement. *Id.* at 756, 766.

We distinguished *Town of Castle Rock*, characterizing it as "fundamentally, a case about inaction"; yet Appellants had "alleged affirmative misconduct on Lioi's part such that his actions 'directly caus[ed] harm to the injured party.'" *Robinson*, 536 F. App'x at 345 (alteration in original) (quoting *Pinder*, 54 F.3d at 1177). Therefore, we held that Deputy Lioi's actions "were on that 'point on the spectrum between action and inaction' such that his acts created 'the dangerous situation that resulted in [Mrs. Williams'] injury.'" *Id.* at 345–46 (alteration in original) (quoting *Pinder*, 54 F.3d at 1175, 1177).

63

We also rejected a defense of qualified immunity, explaining that "a reasonable police officer in Lioi's position would have known that a law enforcement officer affirmatively acting in a conspiracy with a third party to avoid arrest on assault charges could give rise to a constitutional violation when the third party acts in furtherance of the conspiracy to injure another person." *Id.* at 347. That is, Deputy "Lioi's conduct as alleged in the complaint was not in a gray area; he crossed a bright line." *Id.*

The majority now does an about-face, finding that *Town of Castle Rock* is in fact controlling and that Appellants' evidence amounts to nothing more than omissions by Deputy Lioi and Major Russell. Despite, as discussed below, disputes with respect to several facts that support the allegations this Court previously held sufficient to show a state-created danger, the majority now holds that this case involves "only conduct that is confined to a failure to execute the warrant." Maj. Op. at 42 (emphasis omitted). This conclusion, in my view, is not only unwarranted in light of the disputed facts, but it also flies in the face of the well-established doctrine that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009) (citation omitted); *accord Carlson v. Boston Scientific Corp.*, 856 F.3d 320, 325 (4th Cir. 2017); *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 666 (4th Cir. 2015); *Winston v. Pearson*, 683 F.3d 489, 498 (4th Cir. 2012); *L.J. v. Wilbon*, 633 F.3d 297, 308 (4th Cir. 2011).

Rather than follow the law-of-the-case doctrine, the majority seeks to rescind our prior holding, shielding its decision to do so with the defense that we are now at the

summary judgment stage. However, the law-of-the-case doctrine does not cease to have import merely because a different standard now applies at this later stage of the case. Instead, the doctrine contemplates that the same legal ruling will continue to apply despite the varying standards that may apply in subsequent stages of litigation; the court's decision of law continues to govern the "same issues *in subsequent stages* in the same case." *TFWS*, 572 F.3d at 191 (emphasis added). Those subsequent stages include not only those in the same court, but "all subsequent proceedings in the same case in the trial court or on a later appeal." *Everett v. Pitt Cty. Bd. of Educ.*, 788 F.3d 132, 142 (4th Cir. 2015) (quoting *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999)). The standard applied by a reviewing court on appeal will often differ from the standard applied by the trial court. And our standard of review in a subsequent appeal may also differ from the standard under which we reviewed the case in a prior appeal. Yet the law-of-the-case doctrine continues to apply. *See, e.g.*, *Oberg*, 804 F.3d at 657 (applying law of the case established in first appeal to subsequent appeal); *S.C. State Ports Auth. v. Silver Anchor, S.A. (Panama)*, 23 F.3d 842, 846 (4th Cir. 1994) (finding that district court misapplied the law of the case when it considered a narrower question than that which this Court remanded for determination); *Stonega Coke & Coal Co. v. Price*, 116 F.2d 618, 621 (4th Cir. 1940) ("When the finding upon the first hearing was affirmed, it became the law of the case and was binding upon the parties, as well as upon the lower court, and was not subject to re-examination upon the remand.").

Of course, I remain mindful of the summary judgment standard under which this appeal is reviewed. The law-of-the-case doctrine does not preclude proper application of

that standard of review. Nonetheless, the fact that we are now at summary judgment by itself does not warrant a departure from the law of the case. If that were so, the doctrine would have little, if any, effect. Any legal determination made at the pleading stage would never be applicable in later stages of the case where more than the pleadings are before the court. Moreover, and ironically, it is the majority that misapplies the summary judgment standard here, as I discuss below.

I am also mindful that the law-of-the-case doctrine "is not absolute" and has exceptions. *Capital Inv'rs Co. v. Ex'rs of Morrison's Estate*, 584 F.2d 652, 654 (4th Cir. 1978). It need not be followed where "substantially different evidence" is developed after the law of the case is decided, where "controlling authority has since made a contrary decision of law applicable to the issue," or where "the prior decision was clearly erroneous and would work manifest injustice." *TFWS*, 572 F.3d at 191 (citations omitted); *Sejman v. Warner-Lambert Co., Inc.*, 845 F.2d 66, 69 (4th Cir. 1988). Adherence to the law of the case may also give way when a court's subject matter jurisdiction is in question. *See Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003).

I cannot agree, however, that the facts developed in discovery in this case are "substantially different" such that they warrant a departure from our prior holding that the affirmative acts committed by Deputy Lioi created or enhanced the danger to Mrs. Williams. *See* Maj. Op. at 20. I also cannot agree that Appellants' burden at this stage is to present facts that "strengthen" their "earlier allegations." *Id.* at 24. We have already concluded that the allegations as pleaded—absent any strengthening—sufficiently stated a claim. Appellants' burden at this stage, a burden which I believe to be satisfied, is merely

66

to present sufficient evidence from which a reasonable jury could find their pleaded allegations to be true.[6]

"We are not writing on a blank slate, at liberty to revisit our [prior] decision . . . on a whim." *Winston*, 683 F.3d at 498. Because the record contains sufficient evidence to support the allegations of Appellants' complaint—allegations which we have already concluded state a due process claim—I would reverse summary judgment and allow Appellants to try their case to a jury.

B.

On the record developed since the previous appeal, a reasonable jury could conclude that Deputy Lioi and Major Russell took several affirmative steps to allow Williams to evade arrest and that, as a result, Williams remained free from arrest long enough to stab his wife on a date on which he knew exactly where she would be.

---

[6] The majority cites to *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319 (3d Cir. 2016), for the proposition that the law-of-the-case doctrine "poses no bar to normal reassessment of past holdings based on a different procedural posture when, as is the case in the progression from review of a motion to dismiss to a motion for summary judgment, that later review expands the court's inquiry based on development of actual facts underlying a plaintiff's claims." Maj. Op. at 18–19. *Wiest*, however, does nothing to support the majority's view that the law of the case does not apply here. In *Wiest*, the Third Circuit rejected the plaintiff's argument that the defendant's summary judgment motion "was procedurally barred" by the district court's prior determination that the complaint stated a claim. 812 F.3d at 329–30. That is not the case here. Neither Appellants nor I assert that summary judgment is barred altogether because of the favorable motion-to-dismiss decision. Rather, as the *Wiest* panel appropriately explained, the question now presented to the Court is whether Appellants have "come forward with sufficient evidence from which a reasonable jury could find that the [complaint's] allegations are, indeed, true." *Id.* at 330 (citation omitted). To that question, I believe the answer is a resounding "yes."

In evaluating the evidence, we must remember what Appellants' claim is and what this Court has already decided. Appellants do not claim that each of the officers' alleged actions individually resulted in Williams's wholesale escape from arrest. Nor do they claim that the officers were complicit in Williams's plan to murder his wife, or even that they knew of that plan. Appellants claim instead that Deputy Lioi and Major Russell participated in a conspiracy to allow Williams—a prominent community figure—to remain free from arrest. And it was Williams's ability to remain free from arrest until November 17, 2008, that gave him the opportunity to fatally attack his wife. Each of the officers' acts was taken in furtherance not of a conspiracy to kill Mrs. Williams, but a conspiracy to keep Williams out of jail. And because that conspiracy enhanced the danger to Mrs. Williams, we found that Appellants had successfully pleaded a due process claim under a state-created danger theory. *Robinson*, 536 F. App'x at 344.

1.

The acts performed by Deputy Lioi are undisputed. He authored two letters and several text messages regarding the events leading up to Mrs. Williams's miscarriage and death. And instead of arresting Williams, he arranged for Williams to turn himself in on the date Williams requested. No semantic acrobatics are needed to deem these actions affirmative acts and not mere omissions. Of course, what is disputed is whether these affirmative acts were in furtherance of a conspiracy to allow Williams to evade arrest—a conspiracy that ultimately enhanced the danger to Mrs. Williams. A reasonable jury could find that they were.

68

Construed in the light most favorable to Appellants, the letters that Deputy Lioi wrote can reasonably be viewed as his attempt to assist Williams in evading arrest by any authorities presented with the letters. Though the first letter explained that Williams had attempted to turn himself in, it misleadingly omitted the fact that the warrant had been located shortly after Williams was allowed to leave the precinct and that Williams had secured another four days of freedom before he agreed to turn himself in. The subsequent email implied that Williams was not otherwise a wanted man. The email was prepared without any investigation by Deputy Lioi into the identity of the Cleaven Williams listed on the 2003 warrant, despite Deputy Lioi's testimony that he could have ascertained the proper identity.

The majority concludes that these letters cannot support Appellants' claim in part because they "state facts." Maj. Op. at 26. Apparently, the majority believes that an affirmative act requires more than affirmative action; it also requires deceit or express inaccuracies. Such a rule finds no support in the law. Moreover, the mere recitation of facts or "then-existing opinions" did not, as I have highlighted, make the letters any less misleading. Deputy Lioi carefully selected the facts that he included in the letters and purposely excluded other highly relevant facts. Crafting the letters in such a way only supports Appellants' allegation that Deputy Lioi was conspiring with Williams to allow him to remain a free man a while longer; if Deputy Lioi were merely documenting the facts, with no motive to assist Williams in evading arrest, there would be no reason to cherry-pick the information he included.

Indeed, the men's text message exchange suggests that Deputy Lioi's "then-existing opinions" were not so benign. Despite expressing some misgivings about Williams's request for the letters, Deputy Lioi nonetheless "trust[ed]" Williams's "method to [his] madness." J.A. 101, 692. And this letter-writing was far from routine. Deputy Lioi had never before in his twenty-year law enforcement career written such letters and confirmed he would "[p]robably not" write any such letters for someone that he did not personally know, but that Williams was an "unusual" case; the officers knew him and he was a community leader. J.A. 287–88.[7] These acts do not show simple "negligen[ce] in pursuing service of the warrant." Maj. Op. at 28. Construed in the proper light, the letters demonstrate Deputy Lioi's highly unusual acts to provide assistance to Williams, assistance aimed at keeping Williams out of police custody a while longer, assistance that Deputy Lioi otherwise has not and does not provide but provided to Williams because of his status as a community leader.

Similarly, Deputy Lioi's text message exchange with Williams on the day Williams killed his wife is evidence of his participation in the conspiracy to delay Williams's arrest until the date of Williams's choosing. As with the letters, those text messages conveyed "factual information." Maj. Op. at 27. But they also advised Williams of the consequences of his failure to avoid contact with his wife: such contact could "force [the officers'] hand to

---

[7] When Deputy Lioi was asked "how many other times have you written a letter for somebody" like the letters he wrote for Williams, Deputy Lioi responded "[r]emember, this was an unusual circumstance based on the fact that we knew this guy as a community leader." J.A. 287. As the majority appears to accept, the reasonable inference can be made that Deputy Lioi had never previously written such letters.

serve the warrant." J.A. 705. Those text messages demonstrate, in Deputy Lioi's own words, his desire *not* to do his job and instead to defer to Williams's prearranged self-surrender schedule. Indeed, despite the difficult time that officers had in locating the warrant, Deputy Lioi held onto the warrant for three days without delivering it to Central Records when it was finally located. The text exchange also suggests that Deputy Lioi sought to avoid doing his job despite his knowledge that Williams could seek out his wife—the victim of domestic violence whose testimony provided probable cause for the issuance of the warrant in the first place. Deputy Lioi knew that Mrs. Williams had sought protection from her husband. Had Deputy Lioi simply not desired to serve the warrant, this might have been a different case. But Deputy Lioi communicated his desire to avoid being "force[d]" to do his job to the very subject of the arrest warrant. In doing so, Deputy Lioi went beyond simply refraining from aggressively serving the warrant. Viewing the text message exchange in combination with the letters that Deputy Lioi wrote and Deputy Lioi's arrangement with Williams to turn himself in on entirely his own terms, a juror could certainly conclude that his conduct assisted Williams in delaying his arrest until the date Williams selected.

This affirmative conduct is distinguishable from the omissions and failures to act that we have found insufficient to show a state-created danger. *See Doe*, 795 F.3d at 431, 439 (concluding that no affirmative act created danger when college president *failed to report* child abuse to law enforcement); *Pinder*, 54 F.3d at 1172, 1175 (finding no affirmative act when officer *failed to charge* petitioner's ex-boyfriend with more serious crime); *see also Town of Castle Rock*, 545 U.S. at 753, 756 (finding no liability where

71

police *failed to respond* to mother's requests to enforce restraining order against her husband). Had the developed record shown that Deputy Lioi merely sat on his hands and failed to pursue any course of action with respect to Williams's arrest, the law-of-the-case doctrine may not have applied, relieving the Court of its obligation to adhere to its prior ruling. *See Carlson*, 856 F.3d at 325 (explaining that a court may depart from the law of the case when "a subsequent trial produc[es] substantially different evidence" (internal citation omitted)). In that case, this matter may very well have fallen neatly in line with *Doe*, *Pinder*, and *Town of Castle Rock*, as the majority holds. But the record shows that Deputy Lioi chose to act. And his conduct "was far more than a mere passive failure to act"; it could reasonably be construed by a jury as affirmative action to permit Williams to "remain free despite the finding of probable cause" for his arrest. *Robinson*, 536 F. App'x at 344.

2.

As for the evidence of Major Russell's conduct, a reasonable jury could likewise conclude that he took affirmative steps, similar to those which we previously held to constitute affirmative acts, to allow Williams to remain at large until Williams himself determined the most convenient time for his arrest.

Like with Deputy Lioi, the record shows that Williams had a relationship with Major Russell. J.A. 439, 444. It is undisputed that the two texted each other and spoke of personal matters and that Major Russell instructed Deputy Lioi to ensure that Williams's self-surrender went "well" and "smoothly." J.A. 288. The fact that Major Russell *said* that he did not ask Deputy Lioi to give Williams any special treatment does not change the other

72

record evidence showing that Major Russell did, in fact, treat Williams differently. *See* Maj. Op. at 8 n.4.[8] He asked his second-in-command to be responsible for Williams's self-surrender, despite the fact that Deputy Lioi had not arrested anyone "since the late '90s" and despite Major Russell's admission that it was "unusual" for someone of Deputy Lioi's rank to supervise a self-surrender. J.A. 467. And Major Russell provided Williams with advice on how to avoid spending an entire weekend in jail, advice that was not routinely given to those with outstanding arrest warrants. J.A. 277–78.

While Major Russell's relationship with Williams alone is not dispositive of Appellants' claim, it informs a factfinder's view of Major Russell's conduct. With respect to that conduct, there is a dispute—a dispute that even the majority acknowledges, Maj. Op. at 36—as to whether Major Russell ordered that the warrant be "pulled," or diverted from the regular course of processing. Major Russell testified in deposition that he was unaware of the warrant until it had already reached Officer Byrd, the day after it was issued and brought directly to the precinct, that he did not pull the warrant after Officer Arroyo picked it up, and that he never possessed it. However,

---

[8] In attempting to minimize the relationship between Williams and the police officers, the majority relies on statements made by those officers that Major Russell did not ask that Williams be given any special treatment. Maj. Op. at 8 n.4. These are nothing more than self-serving statements that are contradicted by other evidence in the record, as I discuss. In fact, Major Russell makes other self-serving statements that clearly are not borne out by the record. For example, he testified that if the officers "knew where [Williams] was he would have been arrested at that time, especially if [the officers] had that warrant in hand." J.A. 468–69. Yet, the warrant was in the hands of the officers as of Friday, November 14; Deputy Lioi testified that they knew how to locate Williams; and yet Williams was not arrested at that time and instead was permitted to prearrange for a second time his self-surrender four days later—an arrangement that Major Russell endorsed.

73

Deputy Lioi testified that after Williams told Major Russell about the warrant, Major Russell "had the warrant pulled." J.A. 270. Moreover, Officer Arroyo testified that he would have bypassed Central Records in this case only upon a superior's orders. And Officer Byrd explained that "[s]omeone took" the warrant from her hand after she discussed the warrant with Major Russell, J.A. 108, that she never attempted service of the warrant, and that she learned that the warrant was found in her patrol car only during discovery in this case. In discussing Major Russell's communication with Williams and the subsequent "pull[ing]" of the warrant, Deputy Lioi described "the whole thing" as "unusual." J.A. 270. Yet Williams was also an unusual suspect; he was a community leader, and Deputy Lioi and Major Russell both treated him differently because of that fact.

With respect to that different treatment, there is also a dispute as to whether Major Russell made "arrangements" for Williams to turn himself in at a date and time certain. Major Russell testified that he "didn't make arrangements for him to turn himself in." J.A. 455. Rather, according to Major Russell, he "simply said you need to turn yourself in, and [Williams] agreed." *Id.* Major Russell could not recall deciding on a date and time. *Id.* Major Russell also stated that it "sound[ed] odd" that Williams "pretty much prearranged when he should turn himself back in." J.A. 468. In fact, Williams's

74

arrangement to self-surrender was the first and only such arrangement to be made at the Eastern District during Major Russell's tenure. J.A. 469.[9]

The record also shows that Major Russell did in fact arrange for Williams to turn himself in. Major Russell informed Deputy Lioi of the November 13 arrangement and ensured that Deputy Lioi would be there to process Williams. J.A. 100, 249. Major Russell exchanged text messages with Williams on November 13 regarding Williams's estimated time of arrival. And after the warrant could not be located and Williams was allowed to leave the police station, Deputy Lioi testified that Major Russell agreed with him to allow Williams to "turn himself in at a later date," on Tuesday, November 18. J.A. 277. Moreover, while denying any "prearrangement that [Williams] could stay free for this long," Major Russell also acknowledged that an "agreement" was in place and explained that he was "almost handcuffed" to the "agreement" to allow Williams to self-surrender because police officers "had no clue where [Williams] was." J.A. 469. Yet Deputy Lioi did not hesitate to allow Williams to leave the Eastern District on November 13 after a mere 20-minute search for the warrant because the district police officers "knew [Williams]" and Deputy Lioi was "confident that we would be able to find him." J.A. 563.

In light of this testimony, I disagree with the majority that any involvement by Major Russell in the willful mishandling of the warrant and the broader conspiracy to help

---

[9] The majority highlights testimony that 15 to 20 people self-surrender in the Eastern District each year. Maj. Op. at 35 (citing J.A. 468). The record shows, however, that those people do not prearrange their self-surrender. J.A. 468. Williams's case was the only case of a prearranged self-surrender in the Eastern District that Major Russell could recall. *Id.* at 468–69. In fact, Major Russell characterized such a pre-scheduled self-surrender as "odd." *Id.* at 468.

Williams evade arrest is supported by nothing more than "impermissible speculation." Maj. Op. at 30. Major Russell knew Williams and gave his case particular attention because he was a community leader. Major Russell had the warrant pulled, reviewed the warrant right before it disappeared from Officer Byrd's hand, gave Williams advice he did not routinely give to those who are subject to an arrest warrant, told Deputy Lioi where the warrant could be found,[10] and arranged with Williams two separate dates for his self-surrender—dates that he let Williams determine and the second of which was several days after the warrant was actually located. This all took place despite the fact that, as Major Russell himself explained, open warrants are typically acted upon very quickly in the Eastern District. J.A. 470.

On the evidence presented by Appellants, a reasonable jury could conclude that Major Russell—who knew Williams personally and respected him as a community leader—actively participated in the diversion and delay in execution of the warrant. Such interference with the warrant rises to the level of affirmative action. *Robinson*, 536 F. App'x at 345.

### C.

I also disagree with the majority that Deputy Lioi and Major Russell did not enhance the danger to Mrs. Williams. In our prior opinion in this case, we determined that "Lioi's alleged affirmative acts with his co-conspirator, Cleaven Williams, to avoid

---

[10] Again, the majority's reliance on the statements in Sergeant Tugya's affidavit about his conversation with Officer Byrd regarding the location of the warrant are inadmissible hearsay. *See supra*, note 2.

arrest directly enabled Mr. Williams to perpetrate the harm to Mrs. Williams." *Robinson*, 536 F. App'x at 345. In my view, nothing in the now-developed record supports the opposite conclusion as a matter of law.

First, in relying heavily on the defense expert's testimony that Williams was likely to be released on his own recognizance or on bond within 24 hours of his arrest, the majority overlooks other critical evidence in the record. *See* Maj. Op. at 45–46 (citing J.A. 128). One of the reasons Williams gave for wanting to delay his arrest was that he needed time to raise money for his bail. J.A. 100. Therefore, even if Williams were released on bond—which, of course, was a decision left to the sole discretion of the judge and over which the expert ultimately had no say—the record suggests that he would not have been able to make the bond payment to be released from jail. Moreover, if Williams had been arrested on Friday, November 14 (after the warrant was located), that weekend, or even Monday morning, it is not at all certain that he would have been released from custody by the time his wife left the court proceeding.

More importantly, though, because Williams was a community leader and their acquaintance, Deputy Lioi and Major Russell affirmatively acted so that Williams's arrest was delayed, and their acts "creat[ed] the opportunity for [Williams] to murder his wife." *Doe*, 795 F.3d at 440 (discussing and distinguishing *Robinson*). Although the majority goes to great lengths to downplay the relationship between Williams and the officers, Maj. Op. at 8 & n.4, 31–32 & n.14, the record undisputedly shows that both officers viewed Williams as someone to be treated differently because he was a community leader. Williams was not the ordinary suspect. He enjoyed the special favor of Deputy

Lioi and Major Russell, and the officers' conduct implicitly assured Williams that he would not be arrested until the date of his choosing. The officers knew how to locate him, yet they did not serve the warrant. Deputy Lioi provided him with unusual supportive letters, told him to avoid forcing the officers' hands to arrest him, and told him that he trusted him. Both officers ultimately made arrangements that allowed Williams to stay out of jail until the date that *he* requested.[11]

To be clear, the nexus between the officers' affirmative acts and the enhanced danger to Mrs. Williams does not turn on whether the officers had knowledge of Williams's specific intention to kill his wife. Williams told the officers that he needed the additional time to raise capital for bail, assist his mother, and take care of other unspecified matters. It was unbeknownst to the officers that Williams had more sinister plans.

But the officers' ignorance of those plans is not dispositive of the question of liability. Contrary to the majority's conclusion, both officers did have "personal knowledge" that Williams posed *some* threat to Mrs. Williams's safety. Maj. Op. at 45. Mrs. Williams had in fact sought police protection from her husband. *Cf.* Maj. Op. at 44 ("[N]o evidence shows that Mrs. Williams or anyone else on her behalf ever approached Lioi or Russell to seek protection from her husband."). She sought a protective order,

---

[11] Neither officer was "handcuffed" to the self-surrender arrangements that they made with Williams, as Major Russell and the majority suggest. J.A. 469; *see* Maj. Op. at 35–36 (explaining that the officers "wanted to keep [Williams] communicating and cooperating with them rather than go silent, so they were willing to have him return to self-surrender"). Williams was a known community leader, communicated openly with both officers, and Deputy Lioi was confident that they could locate him.

and a warrant was issued for her husband's arrest on domestic assault charges. Major Russell was informed by Williams that his wife had "got some papers on him," J.A. 706, and personally saw the warrant right after it was issued. Deputy Lioi was also aware of the warrant, certain that it had issued, and exchanged text messages with Williams about the importance of avoiding his wife because "she could say you did anything" and could tell the police that she was "afraid" of Williams. J.A. 702, 705. The officers knew that Williams's assault of his wife was supported by probable cause and that she would likely express fear of her husband if she saw him again. Deputy Lioi was even "afraid of" Williams's "method to [his] madness." 689–90.

It is not impermissible speculation, nor does it require a great leap, to conclude that on this evidence, the officers knew that Williams posed some level of danger to his wife while he remained free from arrest. That is, an increased danger to Mrs. Williams's safety was the natural and foreseeable consequence of the officers' affirmative acts to delay Williams's arrest on the assault warrant. It was not the "indirect and incidental result" of the police department's lack of enforcement. *Town of Castle Rock*, 545 U.S. at 767 (quoting *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 787 (1980)). Rather, as we previously held, the officers' conduct "directly enabled [ ] Williams to perpetrate the harm to Mrs. Williams" and, therefore, "affirmatively placed [Mrs. Williams] in a position of danger." *Robinson*, 536 F. App'x at 345 (second alteration in original) (quoting *Wood v. Ostrander*, 879 F.2d 583, 589 (9th Cir. 1989)).

In concluding that the causal nexus is lacking here, the majority relies improperly, in my view, on our decisions in *Doe* and *Pinder*. Those cases rested primarily on the

finding that the defendants did not affirmatively act. *See Doe*, 795 F.3d at 441 ("Rosa's alleged 'affirmative acts' boil down to a particular inaction."); *Pinder*, 54 F.3d at 1176 ("Pinder's case is purely an omission claim."). And to the extent that *Doe* found that there was an insufficient nexus between the alleged conduct and the harm to the victim because the conduct occurred "beyond the context of immediate interactions between the [state actor] and the plaintiff," *Doe* is readily distinguishable as the defendant there "did not meet or speak with the [plaintiffs], and by all accounts, was not even aware the [plaintiffs] existed." *Doe*, 795 F.3d at 441 (first alteration in original) (citation omitted).

I also am not persuaded that Williams's pre-existing risk to his wife means that nothing the officers did enhanced the danger to Mrs. Williams. As we explained in *Doe*— while distinguishing *Doe* from our prior decision in this case—the officers here "substantially changed a pre-existent danger" to Mrs. Williams; they did not "simply fail to intervene to stop it." *Id.* at 440. For "[t]hough the risk of domestic abuse already existed, the officer[s] 'directly enabled [Williams] to perpetrate the harm to [his wife]' and 'affirmatively placed [Mrs. Williams] in a position of danger.'" *Id.* (quoting *Robinson*, 536 F. App'x at 345). It was the inescapable facts of the officers' affirmative actions that kept Williams out of jail and thus made viable his plan to murder his wife. While the officers were unaware of that murderous plot, a jury could reasonably find that they did conspire to allow Williams to choose the date of his arrest and to remain free from arrest until that date. And it happened that Williams chose to submit to arrest the day after his wife's protective order hearing—the day after he knew with certainty where she would be and at what time, and the day after he fatally stabbed her. Therefore, to

80

hold as a matter of law that Mrs. Williams faced the same risk of death at the hands of her husband regardless of the officers' actions is to do the very thing of which the majority accuses Appellants—engage in impermissible speculation.

Appellants have presented evidence that Deputy Lioi and Major Russell placed Mrs. Williams in greater danger, and a jury should decide whether the nexus requirement is satisfied.

D.

Finally, I cannot agree that Deputy Lioi and Major Russell are entitled to qualified immunity.

In finding that it was not clearly established in 2008 that an officer's "decision to allow self-surrender rather than aggressively serve a misdemeanor arrest warrant" would be a constitutional violation, the majority again improperly construes the disputed facts of this case in the light most favorable to the wrong party. Maj. Op. at 47. As the Supreme Court has emphasized, it is critical that courts evaluating a defendant's entitlement to qualified immunity at the summary judgment stage construe disputed facts and draw all reasonable inferences in favor of the non-movant, "even when, as here, a court decides only the clearly-established prong of the [qualified immunity] standard." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). This is because courts define the clearly established right at issue "on the basis of the 'specific context of the case.'" *Id.* (citation omitted). Therefore, our review of a summary judgment order must "take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.*; *West v. Murphy*, 771 F.3d 209, 213–14 (4th Cir. 2014). By defining the right at issue in

81

the way that it does—as nothing more than a right to be free from a police officer's failure to aggressively serve an arrest warrant and to instead allow the subject of a warrant to self-surrender—the majority accepts Deputy Lioi and Major Russell's construction of the record evidence, effectively "weigh[ing] the evidence and resolv[ing] disputed issues in favor of the moving party." *Tolan*, 572 U.S. at 657 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). This is patently improper. *Id.*

Moreover, the mere lack of binding precedent in 2008 regarding the application of the state-created-danger doctrine in this context is insufficient grounds to conclude that the right at issue was not clearly established. It is settled that an officer can be placed on notice that an action is unconstitutional even when "the very action in question" has not previously been found unlawful. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). That is, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741. As the majority concedes, the general right to be free from affirmative state conduct that creates or enhances the danger that a person faces at the hands of a private citizen was clearly established at the time of Deputy Lioi and Major Russell's actions. And while there may have been no binding precedent addressing the specific circumstances of the case at hand, it requires little more than common sense to understand that a police officer could face liability when she acts to assist the subject of an arrest warrant in evading arrest until a date of his own choosing. *See id.* (determining that a constitutional violation, though novel, "was so obvious" that the Court's case law "gave respondents fair warning that their conduct violated the Constitution"). Such conduct is not the failure to act that *Deshaney* and *Pinder* had

rejected as a basis for liability. Nor is it a simple exercise of police discretion in executing warrants that the Supreme Court spoke of in *Town of Castle Rock*. Rather, it is a "misuse of state authority," which before 2008 had been held to violate the Due Process Clause. *Bright v. Westmoreland Cty.*, 443 F.3d 276, 282 (3d Cir. 2006); *Natale v. Town of Ridgefield*, 170 F.3d 258, 262 (2d Cir. 1999) ("[G]ross abuse of governmental authority [ ] will offend the substantive component of the Due Process Clause."); *see also Cromer v. Brown*, 88 F.3d 1315, 1329 n.9 (4th Cir. 1996) ("In deciding whether [a plaintiff] is asserting a clearly established right, we may examine the pre-existing law outside this circuit." (citing *Pinder*, 54 F.3d at 1176–78)).

In short, this is not a case "in which an officer would be required to reason backward from case law 'at a high level of generality' to determine whether his conduct violated a constitutional right." *Harris v. Pittman*, --- F.3d ---,---, No. 17-7308, 2019 WL 2509240, at *11 (4th Cir. 2019) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). I would find that Deputy Lioi and Major Russell are not entitled to qualified immunity.

## III.

Contrary to the majority's holding, this is not a case of a negligent failure to act. This is not a case in which officers "had no hand in creating the danger but simply stood by and did nothing when suspicious circumstances dictated a more active role for them." *Doe*, 795 F.3d at 440–41 (brackets and citation omitted). The officers here *took* an "active role." They actively allowed and even helped Williams to evade an arrest warrant

83

for which there was probable cause, despite their knowledge of the pending domestic assault charges.

If this case does not present a jury question under a state-created danger theory, it is hard to imagine what would. Must the officers have placed the knife in Williams's hand, diverted the entire police force from the steps of the courthouse where Mrs. Williams was stabbed, and themselves assisted in the killing of Mrs. Williams, as the State suggested during oral argument? The bar to recovery under the theory is a high one, but surely not that high. Indeed, it is imperative in these cases that we refrain from finding that "the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is." *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982). Before this case, our Court had not encountered a case in which the line between inaction and action was crossed. It is disheartening to see that, when finally faced with a record that supports a state-created-danger due process claim, the Court casts it aside into the pile of omission claims.

I would instead find that the law of the case applies, that Appellants have come forward with sufficient evidence to support their due process claim, and that they are entitled to have a jury decide whether Deputy Lioi and Major Russell affirmatively enhanced the danger to Mrs. Williams. And because the disputed facts underlie Appellants' state claims of gross negligence, wrongful death, and survival, I would reverse summary judgment on those claims as well.